**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Viken YACOUBIAN, Defendant–Appellee.**

No. 93–50322.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 4, 1994.

Decided May 11, 1994.

David V. Bernal, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, DC, for plaintiff-appellant.

Peter A. Schey, Carlos Holguin, Law Offices of Schey & Holguin, Los Angeles, CA, for defendant-appellee.

Before: HALL, LEAVY, and FERNANDEZ, Circuit Judges.

Opinion by Judge FERNANDEZ.

FERNANDEZ, Circuit Judge:

At the request of Viken Yacoubian the district court found that because the Immigration & Naturalization Service instituted deportation proceedings against Yacoubian, it was in violation of the court's 1989 Judicial Recommendation Against Deportation ("JRAD") issued pursuant to 8 U.S.C. § 1251(b) (1988). As a consequence, the court permanently enjoined the INS from initiating deportation proceedings against Yacoubian on the basis of his convictions under 18 U.S.C. §§ 371, 844(d) and 26 U.S.C. § 5861(d). The United States appealed. We determine that the district court misconstrued the scope, reach and effect of its JRAD order, so we reverse.

## BACKGROUND FACTS

Yacoubian was born in Beirut, Lebanon on November 9, 1962 and entered the United States on August 28, 1976 with his mother and brother. On November 3, 1982, Yacoubian, along with four co-defendants, was indicted and charged with violations of 18 U.S.C. § 371 (conspiracy to transport explosives for the purpose of injuring or intimidating a person or destroying property and conspiracy to knowingly or intentionally damage or destroy property by means of an explosive), 18 U.S.C. § 844(d) (transportation of explosive materials) and 26 U.S.C. § 5861(d) (possession of explosive materials). Yacoubian's indictment resulted from his participation in a plan to place an improvised explosive device containing dynamite in or near the offices of the Honorary Turkish Consul General in Philadelphia, Pennsylvania. As his part in the conspiracy he obtained a current foreign diplomatic list and transported a co-conspirator to the airport in Los Angeles, California. As he then knew, the co-conspirator was taking explosive components to the east coast for the purpose of carrying out the bombing. After a bench trial, Yacoubian was convicted on all three counts.

Yacoubian then sought a JRAD. Yacoubian's sentencing hearing was continued several times, but before he could be sentenced the court granted his motion for new trial. The government appealed that ruling, and we reversed and remanded for sentencing. On October 30, 1989, the district court sentenced Yacoubian to three years imprisonment, one year probation and 1,000 hours of community service. The court also granted Yacoubian's request for a JRAD under former 8 U.S.C. § 1251(b), which allowed district courts to recommend against deporting an alien convicted of a crime of moral turpitude. The court issued an order which provided: "It is hereby recommended that the conviction of Viken Yacoubian on October 9th, 1984, for violation of 18 U.S.C. § 371, 18 U.S.C. § 844(d) and [26 U.S.C. § 5861(d)], shall not be used as a basis for deportation nor exclusion from this country."

Yacoubian began serving his sentence of incarceration on March 12, 1990 and continued to do so until December 16, 1991. In May, 1991, the INS placed a detainer on Yacoubian based on his convictions. Yacoubian presented the INS with a copy of the October, 1989 JRAD and the INS subsequently lifted the detainer. A few days after he was released from prison and entered the Gateway Community Treatment Center, Yacoubian was arrested on a new detainer issued by the INS and also based on his earlier convictions. Yacoubian sought a temporary restraining order. The district court granted Yacoubian's request.

On February 22, 1993, the district court held a hearing on Yacoubian's motion to enforce the JRAD. The INS argued that Yacoubian was deportable, notwithstanding the JRAD, because: (1) consistency demanded it, since one of his other co-conspirators had recently been ordered deported; (2) the destructive device offense was not a crime of moral turpitude and therefore was not covered by the JRAD; and (3) additionally, the destructive device offense formed the basis for deportation under another subsection of § 1251, which was amended in 1990 to apply

to aliens like Yacoubian. The INS also argued that, under the principle of exhaustion of administrative remedies, Yacoubian was obligated to contest the INS's actions during deportation proceedings before the immigration court, not before the district court.

The district court held that the INS had violated the JRAD and permanently enjoined the INS from initiating deportation proceedings against Yacoubian on any grounds based on the three convictions in this case. This appeal followed.

## STANDARD OF REVIEW AND JURISDICTION

### A. Standard of Review

■ This court reviews issues of law like jurisdiction, separation of powers, ex post facto and double jeopardy claims de novo. *See generally United States v. McConney,* 728 F.2d 1195, 1201–04 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). "A district court's grant of permanent injunctive relief is reviewed for an abuse of discretion or application of erroneous legal principles." *Dexter v. Kirschner,* 984 F.2d 979, 982 (9th Cir.1992).

### B. Jurisdiction

In general, the district court had jurisdiction under 18 U.S.C. § 3231 and 8 U.S.C. § 1251(b).

In general, we have jurisdiction pursuant to 28 U.S.C. § 1291. However, Yacoubian claims that we lack jurisdiction over all or a part of this appeal, and the INS claims that the district court (and ultimately this court) lacked jurisdiction to decide the merits of the issues leading to the violation order in the first place.[1] Before considering the merits, we must address these threshold arguments.

### 1. The Notice of Appeal

■ Yacoubian contends that the INS did not file its Notice of Appeal from the district court's order in a timely manner. He argues that although the order itself was civil in nature, the dispositive factor under Fed.

---

1. The district court construed the JRAD, found a contempt, and enjoined future deportation proceedings. We need not, and do not, consider any

separate contempt issues because their determination must, in any event, fall with the remainder of the district court's order.

R.App.P. 4 (1993) is the nature of the case in which the order was granted, and because the order was issued "[i]n a criminal case", the INS was required to (but did not) file its Notice of Appeal within thirty days of the order's entry. Fed.R.App.P. 4(b). The INS counters that since it is appealing from a civil proceeding which occurred during the course of a criminal case, the sixty day time limit for appeals in civil cases under Fed.R.App.P. 4(a)(1) applies and its appeal (filed 56 days after entry of the order) is therefore timely. We agree that the civil time limit applies.

Based on the plain language of Rule 4 alone, Yacoubian does have an appealing argument. Rule 4 speaks of the time for appeal being based on the nature of the case, not the particular order involved. Rule 4(a) is entitled "Appeals in Civil Cases" and prescribes a 60 day time limit for appeals by the United States "[i]n a civil case", whereas Rule 4(b) contains the heading "Appeals in Criminal Cases" and states "[i]n a criminal case the notice of appeal ... by the INS ... shall be filed ... within thirty days after the entry of" the order appealed from. We have usually favored a plain reading of the rule and have refused to "rewrite [it] to make it apply to proceedings that are not within its clearly stated scope." *In re Grand Jury Proceedings (Manges)*, 745 F.2d 1250, 1251 (9th Cir.1984) (refusing to apply Rule 4(b) time limits to an appeal from an order quashing a grand jury subpoena because a claim concerning a grand jury subpoena is a civil action and is therefore subject to the time limits in Rule 4(a)).

Nonetheless, our previous rulings indicate that Rule 4(a), the civil notice of appeal provision, should apply here because we are being asked to review a civil order, even though it was issued in a criminal case. In *United States v. Kismetoglu*, 476 F.2d 269, 270 n. 1 (9th Cir.) (per curiam), *cert. dismissed*, 410 U.S. 976, 93 S.Ct. 1454, 35 L.Ed.2d 709 (1973), we held that the government's appeal of an order enjoining it from filing a forfeiture action against an acquitted defendant in a criminal case was subject to the civil appeal provisions in Fed.R.App.P. 4(a) because "[a]lthough incorporated in a judgment in a criminal proceeding, the in-

junction appealed from [was] civil in nature...." Conversely, in *Yasui v. United States*, 772 F.2d 1496, 1499 (9th Cir.1985), we declined to apply the civil time limit to a notice of appeal of a denial of a post-sentence petition for writ of error *coram nobis* which alleged that the curfew law under which the petitioner had been convicted was unconstitutional. Our reason was that the petition constituted "a step in the criminal case" in light of its purpose of "setting aside [ ] the petitioner's criminal indictment and conviction." We distinguished appeals of rulings on 28 U.S.C. § 2255 motions to set aside criminal convictions, which are statutorily governed by the civil appeal provision, on the ground that "28 U.S.C. § 2255 ... establishes a special, statutory remedy with its own particular procedural requirements and limitations, and explicitly authorizes the taking of appeals as in habeas corpus cases. No such structure surrounds the *coram nobis* writ." *Id.* Taken together, *Kismetoglu* and *Yasui* indicate that even in a criminal case where a civil order, which does not constitute a "step in the criminal case," is appealed from, the civil time limits in Rule 4(a) apply.

In the instant case, the INS appeals an order directed against it, which, as to it, constitutes a civil action or proceeding. *See, e.g., In re Grand Jury Proceedings*, 894 F.2d 881, 882 (7th Cir.1989) ("A federal civil contempt proceeding is a civil proceeding governed by the rules of civil procedure."); *Rogers v. Webster*, 776 F.2d 607, 610 (6th Cir. 1985) ("Civil contempt is a civil action and governed by the Federal Rules of Civil Procedure."). It was not a party in the criminal case. Also, although the order and injunction emanate from a JRAD made in a criminal case, the ruling appealed from is directed toward civil proceedings—deportation. Moreover, the order appealed from did not constitute a step in the criminal case in which it was issued because it did not seek an adjudication concerning Yacoubian's criminal conviction; rather, it sought to enforce the court's previous collateral order recommending against deportation. *See Mahler v. Eby*, 264 U.S. 32, 39, 44 S.Ct. 283, 286, 68 L.Ed. 549 (1924) ("It is well settled that deportation, while it may be burdensome and severe for the alien, is not a [criminal] punish-

ment."); *United States v. Koziel,* 954 F.2d 831, 835 (2d Cir.1992) (although "Congress [ ] intended JRADs to be closely tied to the sentencing process, . . . [and] the denial of a JRAD to be part of the 'penalty' imposed on a person convicted of the specified crimes, . . . there can be no doubt . . . that it is a *civil* penalty.") (citations omitted) (emphasis in original). The mere fact that the JRAD is part of the sentencing process does not convert *it* or proceedings enforcing it into criminal proceedings. *Id.; see also United States v. Murphey,* 931 F.2d 606, 609 (9th Cir.1991) (statute eliminating JRADs mooted cases then on appeal, for even if district court erred in denying JRAD the error could not be corrected). Therefore, we determine that the civil appeal time limits under Fed. R.App.P. 4(a)(1) apply and the INS's notice of appeal was therefore timely filed.

## 2. Review of the Merits of the JRAD

■ Yacoubian next contends that, to the extent the INS seeks to challenge the merits of the district court's issuance of the JRAD (specifically, its implicit conclusion that Yacoubian's destructive device conviction constituted a crime of moral turpitude), we cannot consider the INS's appeal because it failed to timely contest the JRAD itself in the district court at the time of its issuance or on direct appeal to this court. The issue is not strictly jurisdictional but Yacoubian is correct so we discuss it here. "A judgment or decree of this court, if appealable, is, after no appeal is taken, conclusive upon the parties." *International Mfg. Co., Inc. v. Landon, Inc.,* 327 F.2d 824, 825 (9th Cir.1964) (per curiam); *see also Hook v. Arizona, Dep't of Corrections,* 972 F.2d 1012, 1017 (9th Cir.1992) ("The consent decree is a final, binding judgment that was never appealed. Therefore, we refrain from addressing the [INS's] . . . argument. . . ."). Because the INS failed to appeal the JRAD order to this court in order to contest the district court's finding that Yacoubian's destructive device conviction constituted a crime of moral turpitude, it cannot now collaterally attack that finding in this court by challenging the contempt order issued to enforce it. *See Landon,* 327 F.2d at 825 ("The appellants cannot collaterally attack the [injunction] order of July 2, 1963, now final, by appealing from the order of

November 19, 1963," by which the district court refused to modify or dissolve the injunction.). Therefore, we decline to entertain the INS's ill-timed argument that the destructive device offense of which Yacoubian was convicted was not a crime of moral turpitude.

## 3. The District Court's Jurisdiction to Enforce its JRAD Order

■ The INS claims that Yacoubian should have presented his arguments concerning the effect of the district court's JRAD during the course of the deportation proceedings sought to be instituted, and that by bringing his grievances to the district court in the first instance Yacoubian failed to exhaust his administrative remedies. Therefore, it says the district court lacked jurisdiction to issue any order to enforce the JRAD. We cannot agree.

The INS's position is based upon a faulty premise. Title 8, Section 1105a(c), on which the INS relies, provides that "[a]n order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations. . . ." Nothing in that provision removes the power of a district court to enforce its own properly issued orders. "There [is] no question that courts have inherent power to enforce compliance with their lawful orders. . . ." *Shillitani v. United States,* 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *see also Hook,* 972 F.2d at 1014 ("A district court retains jurisdiction to enforce its judgments. . . ."). Moreover, a valid JRAD "is absolutely binding on the Attorney General and leaves him with no discretionary authority." *Velez–Lozano v. INS,* 463 F.2d 1305, 1308 (D.C.Cir.1972).

*Wang Zong Xiao v. Barr,* 979 F.2d 151 (9th Cir.1992), cited by the INS for the proposition that Yacoubian was obligated to contest the INS's actions before an immigration judge, does not indicate that the district court's power to enforce its own orders was in any way circumscribed. *Xiao* held that, given the exhaustion mandate in 8 U.S.C.

§ 1105a(c) and the availability of habeas corpus relief, the district court could not exercise jurisdiction over an alien's motion for a preliminary injunction, which was filed after the INS notified him that he was being placed in administrative exclusion proceedings. In the instant case, unlike *Xiao*, the statutory exhaustion mandate of 8 U.S.C. § 1105a(c) does not, by its own terms, apply simply because the district court was asked to enforce its own previously-issued order. Yacoubian did not attempt to commence what amounted to a whole new district court case. Thus, *Xiao* is inapposite; it implies no limitation on a district court's power to enforce its own orders. That is not to say that the district court did not reach too far when it ultimately decided the case; it is only to say that it had jurisdiction over the enforcement of its own order in the first place. In other words, the district court properly had jurisdiction, and the fact that it ultimately misconstrued the outer limits of its JRAD order and the effect of that order in later proceedings does not mean that it lacked jurisdiction in the first place.[2]

## DISCUSSION

The district court appears to have believed that the JRAD had the effect of precluding *any* deportation proceedings against Yacoubian based upon the offenses he committed in 1982. We have no reason to believe that the district court intended to act beyond the powers conferred by former 8 U.S.C. § 1251(a)(4) when it first issued the JRAD, so we need not decide whether an attempt to so exceed the power conferred by Congress would be a void act. Whatever the effect of the JRAD might have been when it was issued, what we must decide is its effect at this time. Implicit in any discussion of that issue is the question of whether the application of 8 U.S.C. § 1251(a)(2)(C), made applicable by Congress to aliens like Yacoubian after the district court's issuance of a JRAD on Yacoubian's behalf, violates the separation of powers doctrine in this case because it

results in Congress' overruling of a court's final judgment. We determine that there is no separation of powers violation.

At the time the district court issued the JRAD (October, 1989), 8 U.S.C. § 1251(a)(4) (1988) was the sole deportation provision which potentially applied to the crimes of which Yacoubian was convicted. It provided:

Any alien in the United States ... shall ... be deported who ... is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more, or who at any time after entry is convicted of two crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct....

The district court's JRAD, authorized by 8 U.S.C. § 1251(b)(2) (1988), served to preclude Yacoubian's deportation on this ground alone, and was required to be "given absolute binding effect upon deportation efforts by the I.N.S." on the basis of 8 U.S.C. § 1251(a)(4). *United States v. Bodre*, 948 F.2d 28, 34 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1487, 117 L.Ed.2d 628 (1992). Although 8 U.S.C. § 1251(a)(14) (1988) also provided a separate basis for deportation of aliens who "at any time after entry, shall have been convicted of possessing or carrying in violation of any law any firearm or destructive device" as defined in 18 U.S.C. § 921(a)(3) and (4), that provision did not apply to Yacoubian in 1989 because it was then only applicable to aliens convicted on or after November 18, 1988. *See* Pub.L. No. 100–690, § 7348(b), 102 Stat. 4181, 4473 (1988).

However, in 1990, Congress reorganized 8 U.S.C. § 1251(a) and recodified the slightly modified firearm deportation provision at 8 U.S.C. § 1251(a)(2)(C): "Any alien who at any time after entry is convicted under any law of ... possessing, or carrying in violation of any law, any weapon, part, or accessory

---

**2.** We emphasize that we are dealing with a JRAD issued by a federal district court. We have no occasion to decide whether in this intensely federal area of the law a different rule should apply to JRADs issued by state courts. *But cf. Haller v.*

*Esperdy,* 397 F.2d 211, 215 (2d Cir.1968) (where INS did not have notice of a JRAD request, once the JRAD issued the INS could not deport the alien before it returned to state trial court to present its opposition to the JRAD).

which is a firearm or destructive device ... is deportable." The Savings Provision applicable to the amended section provided:

Except as otherwise specifically provided ... the provisions of such section, as amended by this section, shall apply to all aliens described in subsection (a) thereof notwithstanding that (1) any such alien entered the United States before the date of the enactment of this Act [November 29, 1990], or (2) the facts, by reason of which an alien is described in such subsection, occurred before the date of the enactment of this Act [November 29, 1990].

Pub.L. No. 101–649, § 602(c), 104 Stat. 4978, 5081–82 (1990). These amendments did "*not* apply to deportation proceedings for which notice has been provided to the alien *before* March 1, 1991." *Id.* § 602(d), 104 Stat. at 5082 (emphasis added). In other words, as of November 29, 1990—more than one year after the date of issuance of the JRAD in this case—8 U.S.C. § 1251(a)(2)(C) became a separate basis for deporting aliens like Yacoubian, who had been convicted of a firearm offense at any time before November 29, 1990 and for whom notice of deportation was given after March 1, 1991. *See Chow v. INS,* 12 F.3d 34, 37–38 (5th Cir.1993). This Congressional action changed the effect of the JRAD issued in Yacoubian's case. Yacoubian was rendered deportable when previously, under the JRAD and the law at the time of the JRAD's issuance in 1989, he would not have been deportable based upon any of his convictions. That, in turn, undercut the effectiveness of the JRAD itself.

In *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), the Supreme Court determined that a law which deemed a presidential pardon prima facie evidence of disloyalty and cause to enter judgment for the INS in court disputes was violative of separation of powers. *Klein* involved a judgment in favor of an intestate's administrators, who asserted a claim for the proceeds of goods confiscated by the INS, based on a presidential pardon of the intestate for his participation in the rebellion which precipitated the Civil War. The Court held that the subsequently enacted congressional legislation which directed that pardons result in favorable judgments for the INS impermissibly encroached on the executive power of pardon and improperly attempted to direct courts to decide cases in a particular way.

In this case, Congress did not run afoul of *Klein* or related Supreme Court authority, *e.g., Pennsylvania v. Wheeling & Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856), by amending 8 U.S.C. § 1251(a). Rather than "impermissibly direct[ing] certain findings in pending litigation," *Gray v. First Winthrop Corp.,* 989 F.2d 1564, 1568 (9th Cir.1993) (internal quotation omitted), the amendments merely changed the underlying law so that aliens not previously deportable became deportable. Nevertheless, it could be argued that the 1990 amendments are unconstitutional on two independent grounds: the due process clause and the principle that Congress may not direct courts to reverse final judgments. *See id.* at 1570–71, 1572–74.

"[T]he Supreme Court has consistently held that Congress may enact legislation with retroactive effect so long as it comports with Due Process by passing constitutional muster under rational basis scrutiny." *Id.* at 1570; *see also Lehmann v. United States ex rel. Carson,* 353 U.S. 685, 690, 77 S.Ct. 1022, 1024, 1 L.Ed.2d 1122 (1957) (determining that since Congress may legislate retrospectively, alien could be made deportable under the Immigration and Nationality Act of 1952 for 1936 convictions of crimes involving moral turpitude which were not unconditionally pardoned); *Mulcahey v. Catalanotte,* 353 U.S. 692, 694, 77 S.Ct. 1025, 1027, 1 L.Ed.2d 1127 (1957) (alien made deportable under the 1952 Act for 1923 narcotics convictions). While "retroactive legislation does have to meet a burden not faced by legislation that has only future effects," that burden is met "simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984). Section 1251(a)(2)(C) survives this scrutiny because its means—retroactive application of the firearm (destructive device) conviction deportation provision—is rationally related to a legitimate

governmental purpose. It results in uniform application of the deportation provision to aliens convicted of firearm offenses, no matter when those convictions occurred.[3] *See generally Gray*, 989 F.2d at 1573 (setting forth rational basis rubric); H.R.Conf.Rep. No. 101–955, 101st Cong., 2d Sess. 119, 132 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6710, 6784, 6797 ("[T]he Conference report broadens the list of serious crimes, conviction of which results in various disabilities and preclusion of benefits under the Immigration and Nationality Act."); Statement by President George Bush Upon Signing S. 358 [The Immigration and Nationality Act of 1990], 26 Weekly Comp.Pres.Doc. 1946 (Dec. 3, 1990), *reprinted in* 1990 U.S.C.C.A.N. 6801–1 ("S. 358 meets several objectives of my Administration's war on drugs and violent crime. Specifically, it provides for the expeditious deportation of aliens who, by their violent criminal acts, forfeit their right to remain in this country. These offenders, comprising nearly a quarter of our Federal prison population, jeopardize the safety and well-being of every American resident.").

█ Alternatively, it could be argued that section 1251(a)(2)(C) violates separation of powers because it interferes with the adjudicatory process and directs the courts to reverse a final judgment. For separation of powers purposes, the judgment in Yacoubian's case is "final" because the time for appeal of the JRAD ran without any party's appeal rights being exercised—the availability of appeal has expired and effectively been exhausted. *See Griffith v. Kentucky*, 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987) (judgment is "final" where "the availability of appeal [is] exhausted, and the time for a petition for certiorari [has] elapsed or a petition for certiorari finally [has been] denied"). However, section 1251(a)(2)(C) does not mandate the reversal of the district court's JRAD. Rather, it reverses Congress' own previous decision that aliens like Yacoubian who were convicted of firearm offenses before November, 1988 need not be deported on the basis of those convictions, if a JRAD was issued. That decision,

when combined with the JRAD in this case, had the effect of rendering Yacoubian nondeportable at the time of the JRAD's issuance. Thus, the retroactive application of section 1251(a)(2)(C) to Yacoubian does not contravene the terms of the district court order; it reverses the prior statutory law. Because Yacoubian could not acquire a "status of nondeportability[ ] under the prior law" (*Lehmann*, 353 U.S. at 687, 77 S.Ct. at 1023 (internal quotation omitted)), and Congress was within its power to amend the statute and to make that change apply retroactively (*see Gray*, 989 F.2d at 1570), application of 8 U.S.C. § 1251(a)(2)(C) to Yacoubian does not offend the Constitution. *See Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*, 899 F.2d 814, 825–26 (9th Cir.) (congressional enactment did not violate separation of powers because the prior court judgment did not govern the particular issue addressed by the new statutory enactment), *cert. denied*, 498 U.S. 998, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990).

Once the possibility of a separation of powers violation is eliminated, this case is akin to *Jew Ten v. INS*, 307 F.2d 832, 835 (9th Cir.1962), *cert. denied*, 371 U.S. 968, 83 S.Ct. 551, 9 L.Ed.2d 538 (1963), and *United States v. Quintana*, 914 F.2d 1409, 1411 (10th Cir. 1990), in which the initiation of deportation proceedings against aliens was upheld, despite the existence of JRADs, because deportation was sought on grounds different from those as to which the JRADs were effective. Although, unlike *Jew Ten* and *Quintana*, the alternative grounds on which the INS seeks to deport Yacoubian did not exist at the time of the JRAD's issuance, that distinction is of no significance. The JRAD once had the effect of precluding the deportation of Yacoubian on the basis of his convictions, even though it only forbade deportation based on designation of his convictions as crimes of moral turpitude. However, that was due to the grace of Congress—not the courts. Moreover, there is no reason to hold that Congress meant to surrender *its* power to decide the classes of aliens who should be

---

**3.** It also draws upon Congress' undoubted power to exclude undesirable aliens from this country, even if that determination is made long after a

crime was committed. *See, e.g., Mahler*, 264 U.S. at 38–40, 44 S.Ct. at 286; *Mulcahey*, 353 U.S. at 694, 77 S.Ct. at 1027.

deported when it precluded the INS from seeking to deport some aliens who committed crimes of moral turpitude. Congress could, as it did, later decide that those who committed the type of crime that Yacoubian committed should be deported, regardless of *when* the criminal act was done. That was no invasion of court power. It did upset Yacoubian's expectations, but that is another matter entirely.

In a case similar to this one, but having the additional fact that the United States Attorney agreed to recommend the issuance of the JRAD to the district court as part of a plea bargain, the Eighth Circuit said:

> It is our opinion that, because of the timely recommendations of Judge Reeves to the Attorney General that DeLuca be not deported because of his convictions in 1943, he was not, prior to the effective date of the Immigration and Nationality Act of 1952, subject to deportation because of such convictions. We do not agree, however, that the recommendations of the United States Attorney to the District Judge and the District Judge's recommendations to the Attorney General, under the circumstances disclosed by the record, constituted a binding contract between the United States and DeLuca that he should never be deported because of the convictions. As an alien, DeLuca could not acquire a right to permanent residence in the United States which Congress was bound to respect, nor could the United States Attorney or the District Judge impair the power of Congress to provide for the deportation of aliens whom it considered undesirable.

*United States ex rel. De Luca v. O'Rourke,* 213 F.2d 759, 762–63 (8th Cir.1954). The court went on to say that although aliens are entitled to the protection of the Constitution and laws of this country they "continue to be aliens," and "remain subject to the power of Congress to expel them ... whenever, in its judgment, their removal is necessary or expedient for the public interest." *Id.* at 763 (internal quotation omitted). Thus, the act providing for the alien's deportation was not rendered invalid by its retroactivity. *Id.* So, too, with the case at hand. Application of the later-enacted deportation provision, 8 U.S.C. § 1251(a)(2)(C), to Yacoubian is proper.[4]

In sum, Congress previously gave the Attorney General the power to deport aliens on a number of grounds, one of which was conviction of crimes of moral turpitude. It also said that if a JRAD was issued, the Attorney General could not deport an alien based upon that ground. However, it never precluded itself from changing its mind about who can stay in this country and who must leave it, and this is an area of the law where Congress *can* change its mind. The JRAD *was* effective but "in the mean time [the right it gave] has been modified by the competent authority, so that [it] is no longer [a complete] obstruction" to deportation proceedings. *Wheeling & Belmont Bridge,* 59 U.S. (18 How.) at 431–32.

■ Finally, Yacoubian argues that the application of 8 U.S.C. § 1251(a)(2)(C) to him would violate the *ex post facto* and double jeopardy clauses, because his imminent deportation would constitute an impermissible double criminal punishment for the firearm offense of which he was already convicted and would impose a punishment on him which was unavailable at the time he committed, was convicted of and sentenced for that offense. His arguments are fatally flawed.

■ The *ex post facto* clause of the United States Constitution prohibits the retrospective application of criminal laws that materi-

---

**4.** 8 C.F.R. § 242.16(c), cited by Yacoubian, does not alter this result. Section 242.16(c) merely provides that "[n]o Judicial Recommendation Against Deportation is effective against a charge of deportability under section 241(a)(11) of the Act [deportation for narcotics convictions] *or if the Judicial Recommendation Against Deportation was granted on or after November 29, 1990."* (Emphasis added). Yacoubian contends that because the INS is obligated by its own regulation to honor the court's JRAD, it cannot deport him under the auspices of 8 U.S.C. § 1251(a)(2)(C). As already explained, however, the INS would not violate the JRAD by applying section 1251(a)(2)(C) to Yacoubian, since it would be implementing a statutory section which did not fall within the purview of the JRAD. Likewise, the INS cannot be said to violate its own regulation requiring that the JRAD be given full force and effect by applying the deportation section to Yacoubian, since it would not be contravening the terms of the JRAD itself in any way.

ally disadvantage the defendant. U.S. Const. art. I, § 9, cl. 3, § 10, cl. 1. But it only applies to criminal laws. *See, e.g., Collins v. Youngblood,* 497 U.S. 37, 41, 110 S.Ct. 2715, 2718, 111 L.Ed.2d 30 (1990) ("[I]t has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them."). The Court has consistently classified deportation proceedings as civil in nature and has therefore determined that the *ex post facto* clause has no application to them. *See, e.g., Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954) ("[T]he *ex post facto* Clause ... has no application to deportation."); *Harisiades v. Shaughnessy,* 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952) ("Deportation, however severe its consequences, has been consistently classified as a civil rather than a criminal procedure.... The prohibition of *ex post facto* [therefore] has no application."). Because the change in the immigration laws only makes available the civil penalty of deportation, without increasing Yacoubian's criminal punishment, the *ex post facto* clause is inapplicable. *See Koziel,* 954 F.2d at 835 ("Congress's retroactive elimination, in the 1990 Act, of a sentencing court's power to grant relief from the civil penalty of deportation does not increase the criminal penalties and hence does not violate the *Ex Post Facto* Clause."); *Bodre,* 948 F.2d at 33–35 (same).

■ The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no one shall "be subject for the same offence to be twice put in jeopardy of life or limb." Like the *ex post facto* clause, this clause applies only to criminal or punitive measures successively imposed for the same criminal offense. *See, e.g., Breed v. Jones,* 421 U.S. 519, 528, 95 S.Ct. 1779, 1785, 44 L.Ed.2d 346 (1975) ("the risk to which the Clause refers is not present in proceedings that are not 'essentially criminal' "). Because deportation proceedings are civil and not criminal in nature, they cannot form the basis for a double jeopardy claim either.

## CONCLUSION

However the district court may feel about the merits of Yacoubian and the general sanctity of its own orders, neither its sentiments nor ours can suffice to give the district court the power to issue the order that it did.

Congress has the authority to declare that aliens who have committed certain offenses must leave our shores, regardless of when those offenses were committed. It exercised that authority here. Thus, regardless of the JRAD, Yacoubian cannot avoid facing the administrative proceeding which the INS seeks to commence against him. It is one of the perils of being a peregrine who has displeased his host. We therefore reverse the district court's order in its entirety.

**REVERSED.**