**Usama J. HAMAMA, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 94–4088.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1996.

Decided March 7, 1996.

234

Charles S. Owen, Gatto, Bennett & Owen, Southfield, MI, for petitioner.

David J. Kline, Brenda E. Ellison, U.S. Dept. of Justice, Immigration Litigation, Civ. Div., Washington, DC, Edmund A. Sargus, Jr., U.S. Atty. Columbus, OH, for respondent.

Before: BROWN, SILER, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Usama J. Hamama petitions for review of a decision of the Board of Immigration Appeals affirming a deportation order issued by an immigration judge. We deny the petition.

I

Usama J. Hamama is an Iraqi citizen who has been a lawful resident of the United States since 1974. In 1988 a jury in Michigan state court found Hamama guilty of felonious assault, possession of a firearm in the commission of a felony, and carrying a pistol in a vehicle. The court sentenced him to two years imprisonment on the possession charge and suspended his other sentences.

In 1992 the Immigration and Naturalization Service (the "INS") served notice on Hamama of deportation proceedings against him, based on his having been convicted of a firearms offense. At the deportation hearing, an immigration judge found that Hamama was not deportable because his conviction had occurred before the statute that authorized deportation of aliens convicted of firearms offenses had taken effect. The Board of Immigration Appeals (the "BIA" or "Board") reversed and remanded, finding that the new statute applied to any deportation proceeding for which notice was provided to the alien on or after March 1, 1991, regardless of the date of the firearms conviction.

On remand, Hamama applied for asylum and other relief from deportation, but the immigration judge denied the requests on various grounds. The BIA agreed with the immigration judge's decision and dismissed Hamama's appeal. This petition followed.

II

We first address several constitutional claims. Hamama contends that the deportation order violates his Fifth Amendment rights to due process and equal protection and the Ex Post Facto Clause of Article I, Section 9 of the Constitution. These assertions present questions of law, which we review de novo. *Kabongo v. INS,* 837 F.2d 753, 756 (6th Cir.), *cert. denied,* 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 564 (1988).

A

Hamama argues that the immigration judge's order violates his constitutional right to due process because the statute authorizing deportation of aliens convicted of firearms offenses had not taken effect at the time of his conviction. Hamama's conviction did in fact take place before passage of the relevant provision; he was convicted in 1988, and the immigration judge ordered Hamama deported under 8 U.S.C. § 1251(a)(2)(C), which Congress enacted two years later in section 602(a) of the Immigration Act of 1990 (the "1990 Act"). *See* Pub.L. No. 101–649, § 602(a), 1990 U.S.C.C.A.N. (104 Stat.) 4978, 5077–80 (mandating deportation of aliens convicted of crimes involving firearms). Nevertheless, we hold that the INS may apply the 1990 legislation to Hamama's conviction.

The Supreme Court has repeatedly upheld the constitutionality of deportation proceedings that apply new law to past criminal conduct. *See, e.g., Lehmann v. United States,* 353 U.S. 685, 690, 77 S.Ct. 1022, 1024–25, 1 L.Ed.2d 1122 (1957) (allowing deportation based on convictions that, because of conditional pardon, were not grounds for deportation when they occurred); *Marcello v. Bonds,* 349 U.S. 302, 314, 75 S.Ct. 757, 763–64, 99 L.Ed. 1107 (1955) (allowing deportation based on conviction that was not grounds for deportation when it occurred). With the recent enactment of new deportation laws, this and other circuits have had occasion to reemphasize the Supreme Court holdings. *See, e.g., Campos v. INS,* 16 F.3d 118, 122 (6th Cir.1994); *De Osorio v. INS,* 10 F.3d 1034, 1042 (4th Cir.1993); *Ignacio v. INS,* 955 F.2d 295, 298 (5th Cir.1992); *United States v. Bodre,* 948 F.2d 28, 32 (1st Cir.1991), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1487, 117 L.Ed.2d 628 (1992). Neither the instant case nor any of the recent circuit decisions offers a basis for this court to depart from the Supreme Court's longstanding willingness to allow application of new immigration law to prior criminal conduct. *See Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977) (explaining

exceptionally limited nature of judicial examination of immigration legislation).

Hamama cites *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), in support of his due process argument. *Landgraf* recognized that the retroactive application of legislation can raise due process concerns: "The Due Process Clause ... protects the interests in fair notice and repose that may be compromised by retroactive legislation...." *Id.* at ——, 114 S.Ct. at 1497. We find Hamama's *Landgraf* argument unpersuasive for two reasons. First, it is unclear that Hamama's deportation implicates the kind of retroactivity issues addressed in *Landgraf. See Campos,* 16 F.3d at 122 ("[A] statute is not made retroactive merely because it draws upon antecedent facts for its operation." (internal quotations omitted)). Second, the Supreme Court in *Landgraf* did not exhibit an intent to overrule such cases as *Lehmann* and *Marcello* or to prescribe a new approach to reviewing the application of immigration law to previous criminal conduct. In fact, *Landgraf* involved statutory interpretation, not constitutional scrutiny.

■ In *United States v. Yacoubian,* 24 F.3d 1 (9th Cir.1994), the Ninth Circuit reviewed a due process challenge to the INS's application of section 1251(a)(2)(C) to an alien who, like Hamama, had been convicted of a firearms offense before the passage of the statute. Borrowing the "rational basis" test from a Supreme Court case involving review of retroactive economic legislation, the *Yacoubian* court upheld the constitutionality of the INS's action. *Id.* at 7–8 (citing *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729–30, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984)). We agree that the requirements of due process are satisfied if retroactive application of federal immigration legislation is rationally related to a legitimate government purpose; the courts have deferred in the past to immigration legislation at least as much as they have deferred to economic legislation. *Compare Pension Benefit,* 467 U.S. at 729, 104 S.Ct. at 2717 (discussing "strong deference accorded legislation in the field of national economic policy"), *and Usery v. Turner Elkhorn Mining*

*Co.,* 428 U.S. 1, 15–18, 96 S.Ct. 2882, 2891–94, 49 L.Ed.2d 752 (1976) (discussing presumption of constitutionality of retroactive economic legislation), *cited in Landgraf,* —— U.S. at ——, 114 S.Ct. at 1497, *with Almario v. Attorney Gen.,* 872 F.2d 147, 150 (6th Cir.1989) (noting that "Congress' unfettered discretion over the admission or expulsion of aliens 'is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" (quoting *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 627–28, 97 L.Ed. 956 (1953))). In the present case, the government clearly has a legitimate interest in protecting society from the illegal use of dangerous weapons, and legislation that deports aliens who commit *or have committed* crimes involving firearms is a rational means of furthering that interest.

Of course, the fact that Congress can apply new deportation law to past criminal conduct does not mean that it intended to do so in every instance. Here, however, the legislative intent is clear: the 1990 Act specifically authorizes application of its provisions to all aliens, "notwithstanding that ... the facts, by reason of which an alien is [deportable under new law], occurred before the date of the enactment of this Act." *See* Pub.L. No. 101–649, § 602(c), 1990 U.S.C.C.A.N. (104 Stat.) 4978, 5081–82. Had Congress wished to prohibit the application of the statute to past criminal conduct, it could easily have done so. *See, e.g.,* Anti–Drug Abuse Act of 1988, Pub.L. 100–690, § 7348(b), 1988 U.S.C.C.A.N. (102 Stat.) 4181, 4473 (limiting application of new deportation law to aliens subsequently convicted). Instead, the bill's only restriction was that "[t]he amendments ... shall not apply to deportation proceedings for which notice has been provided to the alien before March 1, 1991." *See* Pub.L. No. 101–649, § 602(d), 1990 U.S.C.C.A.N. (104 Stat.) 4978, 5082. The application of 8 U.S.C. § 1251(a)(2)(C) to prior criminal conduct is therefore in accordance not only with due process restrictions on retroactivity but also with Congress's intent.

## B

■ Although Hamama uses only the term "due process" in his constitutional argument, his brief implies that the deportation order also violates his equal protection rights. *See, e.g.*, Appellant's Br. at 9 (claiming that section 602 of the 1990 Act "arbitrarily insulates one category of aliens from deportation"); *see also Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976) (noting that federal government has equal protection obligations under Fifth Amendment similar to those imposed on states under Fourteenth Amendment); *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954) (same). Hamama seems to be arguing that the 1990 Act unconstitutionally differentiates between those aliens who received notice of deportation proceedings before March 1, 1991, and those who, like Hamama, received notice after that date. Under section 602(d), only the latter are subject to the 1990 Act's new grounds for deportation. *See* Pub.L. No. 101–649, § 602(d), 1990 U.S.C.C.A.N. (104 Stat.) 4978, 5082.

■ "The Supreme Court has long acknowledged that Congress' unfettered discretion over the admission or expulsion of aliens 'is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Almario*, 872 F.2d at 150 (quoting *Shaughnessy*, 345 U.S. at 210, 73 S.Ct. at 628). This deference to Congress with respect to immigration law has led this court to uphold statutory distinctions between classes of aliens "if predicated on a rational basis." *See Newton v. INS*, 736 F.2d 336, 339 (6th Cir.1984); *see also Almario*, 872 F.2d at 152 (examining whether distinction was "rationally related to a legitimate government interest"). Rational basis review does not require us to identify the legislature's actual rationale for the distinction; rather, we will uphold the statute if "there are plausible reasons for Congress' action." *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

Hamama points out that under section 602(d) of the 1990 Act one alien could be deportable and another not deportable—even if both engaged in identical criminal conduct at the same time—simply because one received notice of deportation proceedings before March 1, 1991, and the other did not. This inequity, however, does not make the statute unconstitutional unless Congress had no rational reason for making such a distinction. The decision to allow application of the 1990 Act's new grounds for deportation only in proceedings for which notice was provided to the alien after March 1, 1991, was arguably based on a concern that pending proceedings not be disturbed by the insertion of a new ground for deportation. We cannot say that such reasoning is irrational. The equal protection argument therefore fails.

## C

■ Hamama's last constitutional claim is that the application of the 1990 Act's provisions to his 1988 conviction violates the Ex Post Facto Clause of Article I, Section 9 of the Constitution. The case law, however, makes it abundantly clear that ex post facto principles do not apply in deportation proceedings. *See, e.g., Marcello*, 349 U.S. at 314, 75 S.Ct. at 764 (declining to overturn "decisions holding that the prohibition of the *ex post facto* clause does not apply to deportation"); *Campos*, 16 F.3d at 122 (holding that "the *ex post facto* principle has no application in a civil context such as [a deportation proceeding]").

## III

Hamama also challenges the BIA's decision affirming denial of relief from deportation under three different sections of the Immigration and Nationality Act, Pub.L. No. 82–414, 1952 U.S.C.C.A.N. (66 Stat.) 166 (the "INA"): (1) discretionary relief under section 212(c) (codified as amended at 8 U.S.C. § 1182(c)); (2) withholding of deportation under section 243(h) (codified as amended at 8 U.S.C. § 1253(h)); and (3) asylum under section 208 (codified as amended at 8 U.S.C. § 1158).[1]

1. Section 208 was not originally in the INA; Congress added it as part of the Refugee Act of

## A

Aliens seeking to enter the United States are excluded from doing so if they meet certain conditions described in section 212(a) of the INA. Under section 212(c), however, the Attorney General has the discretion to waive application of the statute's provisions to lawful permanent resident aliens seeking to reenter the United States after a temporary trip abroad. The 1990 Act limited this discretion by prohibiting section 212(c)'s application "to an alien who has been convicted of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least five years." *See* Pub.L. No. 101–649, § 511(a), 1990 U.S.C.C.A.N. (104 Stat.) 4978, 5052 (codified at 8 U.S.C. 1182(c)).

In *Gonzalez v. INS*, 996 F.2d 804, 806 & n. 3 (6th Cir.1993), we held that a lawful resident alien with unrelinquished domicile of at least seven consecutive years who is subject to deportation can seek discretionary relief under section 212(c), even though the statute appears on its face to apply only to aliens entering the country. Such relief, however, is available only if the grounds on which the alien is being deported have a counterpart in section 212(a)'s conditions for exclusion. *Gjonaj v. INS*, 47 F.3d 824, 827 (6th Cir. 1995).

■ Section 212(a) contains no counterpart for the grounds on which Hamama is being deported. Hamama nevertheless seeks relief under section 212(c), claiming that the 1990 Act removed this "exclusion counterpart" requirement, at least as it pertains to aggravated felonies. His argument is that because the amendment to section 212(c) explicitly prohibits discretionary relief for alien aggravated felons who have served at least five years for their crimes, it implicitly makes all other alien aggravated felons eligible for section 212(c) relief, regardless of whether section 212(a) lists a counterpart for their grounds for deportation. He then asserts that possession of a firearm makes him

an aggravated felon within the meaning of amended section 212(c) and therefore, because he has served less than five years, entitles him to consideration for discretionary relief.

We addressed this exact issue in *Gjonaj*. Paljoka Gjonaj, who was to be deported under the same statute as Hamama, 8 U.S.C. § 1251(a)(2)(C) (mandating deportation of aliens convicted of crimes involving firearms), asserted that the amendment to section 212(c) automatically made him eligible for discretionary relief. *See* 47 F.3d at 825, 827. This court rejected the argument on two independent grounds, holding that (1) firearm possession was not an aggravated felony [2] and (2) the 1990 Act did not remove the "exclusion counterpart" requirement. *See id.* The *Gjonaj* holding is directly on point. Therefore, because the grounds on which Hamama is being deported have no exclusion counterpart under section 212(a), the BIA correctly affirmed the denial of section 212(c) relief.

## B

■ Section 212(c) is not the only provision of the INA under which an alien can avoid deportation. The Attorney General has the discretion to withhold deportation under section 243(h)(1) if the "alien's life or freedom would be threatened" by persecution for certain reasons in the destination country. *See* 8 U.S.C. § 1253(h)(1). Hamama applied for withholding of deportation under this statute. Under section 243(h)(2)(B), however, withholding of deportation is unavailable to aliens who, "having been convicted . . . of a particularly serious crime, constitute[ ] a danger to the community of the United States." *See* 8 U.S.C. § 1253(h)(2)(B). The BIA affirmed the immigration judge's denial of Hamama's application, finding that his convictions involved particularly serious crimes. Hamama nevertheless maintains that the crimes for which

---

1980. *See* Pub.L. No. 96–212, sec. 201(b), § 208, 1980 U.S.C.C.A.N. (94 Stat.) 102, 105.

**2.** The 1990 Act expanded the definition of aggravated felony, *see* Pub.L. No. 101–649, § 501(a),

1990 U.S.C.C.A.N. (104 Stat.) 4978, 5048, but the new definitions do not apply to Hamama's case, *see id.* § 501(b) (applying new definitions only to offenses committed after 1990 Act's enactment).

he was convicted were not particularly serious.

■ The Board's holding that Hamama's crime was particularly serious involved the application of law to fact. We therefore review it de novo. *See Tarvand v. INS,* 937 F.2d 973, 975 (4th Cir.1991). Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), however, we defer to an agency's reasonable interpretation of a statute it administers unless "the intent of Congress is clear." Although *Chevron* dealt with a statutory interpretation contained in an Environmental Protection Agency regulation, *see id.* at 840–41, 104 S.Ct. at 2780–81, a number of circuit courts have used the *Chevron* approach in reviewing decisions of the BIA. *See, e.g., Ahmetovic v. INS,* 62 F.3d 48, 53 (2d Cir. 1995); *De Osorio v. INS,* 10 F.3d 1034, 1043–44 (4th Cir.1993); *Mosquera–Perez v. INS,* 3 F.3d 553, 555 (1st Cir.1993). The Supreme Court has also applied *Chevron* to review of a BIA adjudication, although it found that "it [was] clear that Congress did not intend" the interpretation that the Board had espoused and so accorded no deference to the BIA's construction. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 445–50, 107 S.Ct. 1207, 1220–23, 94 L.Ed.2d 434 (1987). These precedents direct us to follow *Chevron* when evaluating a BIA decision.

The threshold inquiry under *Chevron* is "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. at 2781; *see also Cardoza–Fonseca,* 480 U.S. at 449, 107 S.Ct. at 1222 (using "ordinary canons of statutory construction" to determine whether Congress had a clear intent). The language of section 243(h) obviously does not resolve whether Hamama's particular conduct is grounds for denial of withholding of deportation. Nor does it address the more general issue of the definition of "particularly serious crime" under section 243(h)(2)(B). The legislative history, however, indicates that the "particularly serious crime" concept is the codification of federal treaty obligations under the Multilateral Protocol Relating to the Status of Refugees, *see* H.R.Conf.Rep. No. 781, 96th Cong., 2d Sess. 20 (1980), *reprinted in* 1980 U.S.C.C.A.N. 141, 161, an agreement to which the United States is a party. In fact, the phrase "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community" is the very language of Article 33 of the Protocol. *See* 19 U.S.T. 6223, 6276 (1967). Unfortunately, neither the Protocol itself nor its handbook defines "particularly serious." *See In re Frentescu,* 18 I. & N. Dec. 244, 246–47 (B.I.A. 1982); *see also Cardoza–Fonseca,* 480 U.S. at 439, 107 S.Ct. at 1217 (using handbook to interpret Protocol's terms). We consequently conclude that Congress has expressed no clear intent regarding the meaning of "particularly serious crime" in section 243(h)(2)(B).

*Chevron* therefore requires us to ascertain whether Congress has granted the Attorney General express or implied authority to implement section 243(h). *See* 467 U.S. at 843–44, 104 S.Ct. at 2782. Section 243(h)(2) explicitly directs the Attorney General to determine whether an alien has been convicted of a particularly serious crime. *See* 8 U.S.C. § 1253(h)(2). The Attorney General has delegated this express authority to the BIA. *See* 8 C.F.R. § 3.1(d)(1) (1995). Therefore, the Board's interpretation of the term "particularly serious" is controlling unless "arbitrary, capricious, or manifestly contrary to the statute." *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2782 (addressing explicit delegations of authority to an agency).

The Board established the criteria for determining whether a crime is particularly serious in *In re Frentescu,* 18 I. & N. Dec. 244, 247 (B.I.A.1982):

> While there are crimes which, on their face, are "particularly serious crimes" or clearly are not "particularly serious crimes," the record in most proceedings will have to be analyzed on a case-by-case basis. In judging the seriousness of a crime, we look to such factors as the nature of the conviction, the circumstances and underlying facts of the conviction, the type of sentence imposed, and, most importantly, whether the type and circumstances of the crime indicate that the alien will be a danger to the community.

Crimes against persons are more likely to be categorized as "particularly serious crimes."

The Board then proceeded to find that Frentescu's crime, burglary with intent to commit theft, was not particularly serious given the circumstances:

Although the applicant did enter a dwelling, there is no indication that the dwelling was occupied or that the applicant was armed; nor is there any indication of an aggravating circumstance. Further, the applicant received a suspended sentence after spending a relatively short period of time in prison (3 months). Such sentence ... reflects upon the seriousness of the applicant's danger to the community.

*Id.*

■ *Frentescu* also implied that the BIA requires no distinct finding that the alien "constitutes a danger to the community." The Board clarified this point in *In re Carballe*, 19 I. & N. Dec. 357, 360 (B.I.A.1986), explaining that "danger to the community" is a consideration that informs the inquiry into the crime's seriousness, rather than a separate requirement. In other words, when determining whether a crime is particularly serious, the danger that the crime posed to the community should be considered, but no independent finding of "danger to the community" is required to deny withholding of deportation. These interpretations of section 243(h) are not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron* therefore compels us to accept them as controlling. *See* 467 U.S. at 843–44, 104 S.Ct. at 2782.

Nor has the BIA acted arbitrarily in applying *Frentescu* and *Carballe* to Hamama's case. The few facts in the record before us indicate that Hamama, while in his car, angrily waved a gun at another driver who was threatening him with a baseball bat. He was subsequently convicted of three offenses: (1) felonious assault, which involves use of a dangerous weapon during an assault on another person, but without intent to commit murder or "to inflict great bodily harm," *see* Mich.Comp.Laws Ann. § 750.82(1); (2) possession of a firearm during a felony, *see id.* § 750.227b; and (3) carrying a weapon in a vehicle, *see id.* § 750.227(2). The Board examined the elements of these crimes and reasonably determined that Hamama's conduct involved "the substantial risk of violence towards another person." It then concluded that such conduct was contemplated by the "particularly serious crime" language in section 243(h)(2)(B).

■ Hamama argues that the BIA failed to consider certain factors that might have militated against its holding. For instance, the Michigan judge gave Hamama the lightest possible punishment for the firearm possession—two years imprisonment under Mich.Comp.Laws Ann. § 750.227b(1), (3)—and suspended his sentences for the other crimes. This suggests that the incident was not as serious as might first appear. *See Frentescu*, 18 I. & N. Dec. at 247 (stating that light sentence implies lack of danger to community). Nevertheless, we reject Hamama's argument. Even if the Board failed to consider all the *Frentescu* factors, some crimes are facially "particularly serious." *See id.* For instance, the BIA has held that armed robbery and attempted armed robbery are per se particularly serious, *see Carballe*, 19 I. & N. Dec. at 360–61, as is burglary that involves a dangerous weapon or results in physical injury, *see In re Garcia–Garrocho*, 19 I. & N. Dec. 423, 425–26 (B.I.A.1986). Likewise, this court has held that assault with a firearm with intent to murder is so serious that no factual inquiry into individual circumstances is necessary. *See Gjonaj*, 47 F.3d at 826. Other circuits have reached similar results. *See, e.g., Ahmetovic*, 62 F.3d at 52 (holding that first degree manslaughter was inherently particularly serious despite fact that alien had allegedly shot abusive husband in self-defense). The BIA therefore has the prerogative to declare a crime particularly serious without examining each and every *Frentescu* factor. Although the Board might have engaged in a more fact-specific analysis, *Chevron* directs us to defer to the BIA's interpretation and application of those statutes it is charged to administer unless its view is "arbitrary, capricious, or manifestly contrary to the statute." *See* 467 U.S. at 843–44, 104 S.Ct. at 2782. The Board's decision in this case should be accorded such deference.

C

■ Hamama's final argument challenges the BIA's affirmance of the immigration judge's denial of asylum under section 208 of the INA. *See* 8 U.S.C. § 1158. Section 208 itself imposes few limitations on the Attorney General's discretion to grant asylum. *See id.* The Department of Justice, however, has issued a regulation that prohibits granting asylum to any alien who, "having been convicted ... of a particularly serious crime, constitutes a danger to the community." *See* 8 C.F.R. § 208.14(d)(1). We have previously applied this regulation, *see Gjonaj*, 47 F.3d at 826–27, assuming its validity.

Congress enacted section 208 as part of the Refugee Act of 1980. *See* Pub.L. No. 96–212, sec. 201(b), § 208, 1980 U.S.C.C.A.N. (94 Stat.) 102, 105. Subsection (a) expressly confers on the Attorney General the discretion—but not the obligation—to grant asylum to aliens meeting the definition of "refugee" in 8 U.S.C. § 1101(a)(42) and instructs him or her to "establish a procedure" for asylum application. *See* 8 U.S.C. § 1158(a). Congress imposed no constraints on the exercise of this discretion. In short, we are faced with an explicit delegation of authority and the absence of clear legislative guidance. We therefore defer to the regulation and the BIA's application thereof unless "arbitrary, capricious, or manifestly contrary to the statute." *See Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782; *see also Ahmetovic*, 62 F.3d at 50–51 (upholding current 8 C.F.R. § 208.14(d)(1) under *Chevron*'s "arbitrary, capricious, or manifestly contrary" standard).

For the reasons given in our discussion of withholding of deportation under section 243(h), we defer to the Board's decision that Hamama's crime was "particularly serious." In light of this determination, Hamama is ineligible for asylum under 8 C.F.R. § 208.14(d)(1). The Board's decision on asylum does not constitute reversible error.

For the foregoing reasons, we **DENY** the petition for review of the Board's decision.