**Donovan Anthony POWELL**

v.

**Carol JENNIFER, et al.**

**No. 96–CV–72211–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 22, 1996.

Clarence B. Tucker, Detroit, Michigan, for petitioner.

L. Michael Wicks, Asst. U.S. Atty., Detroit, Michigan, for defendant.

### OPINION AND ORDER REGARDING PETITION FOR HABEAS CORPUS RELIEF

ROSEN, District Judge.

#### I. INTRODUCTION

On May 13, 1996, Petitioner Donovan Anthony Powell ("Petitioner") filed a petition for a writ of habeas corpus, requesting that this Court stay his deportation pending fur-

ther action by the Immigration and Naturalization Service ("INS"). Specifically, Petitioner awaits a decision by the INS Board of Immigration Appeals ("BIA") on his motion to stay his deportation and to reopen administrative proceedings. Petitioner has also sought a stay of deportation from the INS District Director in Detroit, Michigan; as explained below, this request forms the basis for this Court's purported habeas jurisdiction.

This matter is replete with novel jurisdictional and legal questions, many of which arise from the recent enactment of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), signed into law on April 24, 1996. In particular, the AEDPA restricts this Court's habeas jurisdiction in deportation matters, and also affects the relief that Petitioner seeks from the INS.

The Court conducted an initial hearing on this matter on May 13, 1996, and instructed the parties to submit supplemental briefs addressing the implications of the AEDPA with regard to: (1) Petitioner's claim for relief, and (2) this Court's jurisdiction. A further hearing was held on June 19, 1996. Upon considering the arguments advanced by counsel at the two hearings and the materials submitted by the parties, the Court is now prepared to rule on the habeas petition. For the reasons set forth below, the Court finds that it lacks jurisdiction over this matter, and accordingly dismisses the petition for a writ of habeas corpus.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner Donovan Anthony Powell ("Petitioner") has lived in the United States since his arrival from Jamaica in 1970, at the age of six. Since that time, Petitioner has maintained his status as a permanent resident alien. Petitioner is a high school graduate, attended college at Purdue University, and is employed as an accountant trainee. In addition, he is the father of four children, all of whom are U.S. citizens.

Petitioner became the subject of deportation proceedings by virtue of three felony convictions. In February, 1988, Petitioner was convicted in Washtenaw County Circuit Court of delivering and manufacturing cocaine. In March, 1990, Petitioner was convicted in Oakland County Circuit Court of carrying a concealed weapon. This same 1990 incident apparently resulted in Petitioner's federal conviction in December, 1991, for being a felon in possession of a firearm.

As a result of these convictions, the INS issued an Order to Show Cause on March 24, 1992, alleging that Petitioner was deportable under § 241(a)(2)(B)(i) and § 241(a)(2)(C) of the Immigration and Nationality Act ("INA"). See 8 U.S.C. § 1251(a)(2)(B)(i) (providing that drug convictions render an alien deportable); 8 U.S.C. § 1251(a)(2)(C) (providing that certain firearms convictions render an alien deportable). At a hearing before an Immigration Judge ("IJ") on September 10, 1993, Petitioner admitted the allegations and conceded deportability, but requested relief pursuant to § 212(c) of the INA, 8 U.S.C. § 1182(c).[1] However, the IJ rejected that request, holding that Petitioner was ineligible for § 212(c) relief due to his previous firearms conviction.[2]

1. Section 212(c) relief is termed a "Waiver of Inadmissibility." This provision permits the Attorney General to "waive" certain violations that would otherwise be grounds for deportation. Such waivers are granted on a purely discretionary basis.

From the plain language of § 212, which is captioned "Excludable aliens," it may appear that § 212(c) applies only to aliens who seek entry into the United States. Indeed, § 212(a) lists various grounds under which aliens are barred from entering the country—in other words, grounds for "exclusion." Section 212(c) then grants to the Attorney General the discretionary authority to waive the grounds of exclusion listed in § 212(a). Despite these references

to exclusion, "it is well settled that § 212(c) relief also applies to deportation of a lawfully admitted alien with an unrelinquished domicile of seven consecutive years." Gonzalez v. INS, 996 F.2d 804, 806 (6th Cir.1993) (citation omitted); see also Francis v. INS, 532 F.2d 268 (2d Cir.1976). Thus, Petitioner's status as an alien subject to deportation does not disqualify him for § 212(c) relief, at least under the widespread interpretation of that provision.

2. Section 212(a) lists various offenses, including certain drug offenses, as grounds for exclusion, and the Attorney General can therefore "waive" these convictions under § 212(c). However, § 212(a) does not include the firearms offenses of

On September 16, 1993, Petitioner appealed the IJ's determination to the INS Board of Immigration Appeals ("BIA"). On January 11, 1996, the BIA affirmed the findings of the IJ and dismissed Petitioner's appeal. The BIA's brief written opinion further noted that Petitioner had not demonstrated eligibility for the avenue of relief recognized in a prior BIA decision, *Matter of Gabryelsky*, Int.Dec. 3213, 1993 WL 495142 (B.I.A. Nov. 3, 1993).[3]

Following the denial of Petitioner's appeal, he began to pursue the avenue of relief approved in *Gabryelsky*. Specifically, Petitioner obtained an "approved" Immigrant Visa Petition, and prepared documents requesting both an adjustment of status pursuant to § 245 and a waiver of admissibility for his narcotics offense pursuant to § 212(c). Next, on March 20, 1996, Petitioner filed a motion to reopen deportation proceedings with the BIA. In conjunction with this motion to reopen, Petitioner requested that the BIA stay his deportation pending its resolution of his motion. On May 13, 1996, the same day Petitioner commenced this action, he also requested a stay of deportation from the District Director of the INS District Office in Detroit, Michigan.[4]

The BIA has yet to resolve Petitioner's motion to reopen his deportation proceedings. Additionally, neither the BIA nor the District Director has acted on Petitioner's requests for a stay of deportation. This collective failure to act, as well as a letter from the INS District Office in Detroit instructing Petitioner to report for his deportation on May 13, 1996, led Petitioner to seek habeas corpus relief in this Court. Petitioner's primary concern is that he will be deported before the BIA decides his motion to reopen.[5] Thus, he asks this Court to order that his deportation be stayed until the BIA resolves his pending motion.[6]

---

which Petitioner was convicted as grounds for exclusion. Because of this omission, the Attorney General cannot "waive" these convictions under § 212(c). *See Campos v. INS*, 961 F.2d 309 (1st Cir.1992); *Matter of Hernandez–Casillas*, Int.Dec. 3147, 1990 WL 385764 (Att'y Gen. Mar. 18, 1991). Therefore, as the IJ found, Petitioner's firearms convictions rendered him ineligible for § 212(c) relief.

3. *Gabryelsky*, which was issued *after* the IJ ruled on Petitioner's request for § 212(c) relief and while Petitioner's appeal was pending before the BIA, approved the use of a combination of statutory provisions in order to waive *both* firearms and drug convictions. First, pursuant to § 245 of the INA, an alien may apply for an "adjustment" to the status of "alien lawfully admitted for permanent residence." 8 U.S.C. § 1255(a). Under BIA and judicial precedents, this discretionary "adjustment" is available notwithstanding firearms convictions, and regardless of whether the alien seeking adjustment might *already* be classified as a lawful permanent resident. *See Tibke v. INS*, 335 F.2d 42 (2d Cir. 1964); *Matter of Parodi*, 17 I & N Dec. 608 (B.I.A.1980). This "adjustment" under § 245 effectively removes any firearms convictions as grounds for deportation, leaving only the drug offenses. Next, as described earlier, an alien subject to deportation can then appeal to § 212(c) in order to obtain a discretionary waiver of his drug convictions. The Court addresses *Gabryelsky* in some detail later in this opinion.

4. The BIA and the District Director have concurrent and independent powers to grant stays of deportation pursuant to 8 C.F.R. § 243.4. For example, if the District Director were to turn down Petitioner's request for a stay of deportation, the BIA could nevertheless decide to grant a stay.

5. If Petitioner leaves the United States, whether voluntarily or otherwise, his motion to reopen will be treated as withdrawn. *See* 8 C.F.R. § 3.2 (motion to reopen treated as withdrawn once alien has left the country); 8 U.S.C. § 1105a(c) (deportation order cannot be reviewed by any court after an alien has departed the United States); *see also Vargas v. INS*, 938 F.2d 358, 361 (2d Cir.1991). Moreover, Petitioner's filing of a motion to reopen does not itself stay his deportation. *See* 8 C.F.R. § 3.8(a); *see also Stone v. INS*, —— U.S. ——, ——, 115 S.Ct. 1537, 1546, 131 L.Ed.2d 465 (1995).

At the May 13 hearing, counsel for Respondent advised the Court that no travel papers had yet been prepared for Petitioner, despite the letter instructing him to report for deportation that day. Counsel for Respondent further advised the Court that Petitioner's deportation was not imminent, and that the Court would be notified should this situation change. Finally, at the June 19 hearing, Respondent assured the Court that no action would be taken to deport Petitioner for at least six weeks, thus giving this Court sufficient time to thoroughly consider and decide this matter.

6. If this motion is decided adversely to Petitioner, he may appeal the BIA's determination to the Court of Appeals. *See* 8 U.S.C. § 1105a; *see also Garay v. Slattery*, 23 F.3d 744, 746 (2d Cir.1994). Such an appeal automatically stays deportation pending a determination by the Court of Appeals.

## III. ANALYSIS

### A. With the Enactment of the AEDPA, This Court Lacks Habeas Jurisdiction Over This Matter Absent a Fundamental Miscarriage of Justice.

As always, before this Court may proceed to the merits of a case, it must first establish its jurisdictional basis for acting. The recent enactment of the AEDPA complicates the jurisdictional inquiry in this matter. Before turning to the changes brought about by the AEDPA, however, it is first instructive to review the scope of this Court's jurisdiction over deportation proceedings as it stood *prior* to the enactment of that statute.

The Immigration and Nationality Act ("INA") expressly provides for judicial review of final deportation orders.[7] In particular, § 106 of the INA provides that the Hobbs Act, 28 U.S.C. § 2341 *et seq.*, "shall apply to, and shall be the sole and exclusive procedure for, the judicial review of all final orders of deportation." 8 U.S.C. § 1105a(a); *see also Stone v. INS,* — U.S. —, — — —, 115 S.Ct. 1537, 1542–43, 131 L.Ed.2d 465 (1995). However, § 106 also sets forth ten exceptions to the general rule that the Hobbs Act governs judicial review; two of these exceptions are relevant to the instant matter. First, judicial review of final orders of deportation must be sought from the Court of Appeals, rather than the District Court. 8 U.S.C. § 1105a(a)(2). Next, § 106,

as it stood prior to enactment of the AEDPA, expressly provided that "any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings." 8 U.S.C.A. § 1105a(a)(10) (West Supp.1996).[8]

Since habeas corpus proceedings necessarily commence in the District Court, *see* 28 U.S.C. § 2241, the habeas provision of § 106 acts as an exception to that section's more general rule that the Court of Appeals is the proper forum for review of deportation orders. In addition, because § 106 provides an express avenue for judicial review of final orders of deportation, it necessarily follows that habeas review should be confined to INS determinations *other than* final orders of deportation. In recognition of this statutory "division of labor," courts have routinely found that District Court habeas jurisdiction is limited to review of denials of stays of deportation. *See, e.g., Galaviz–Medina v. Wooten,* 27 F.3d 487, 492 (10th Cir.1994) (stating that an alien "cannot challenge the merits of his deportation order in district court"); *Dibi v. Moyer,* 801 F.Supp. 214, 219 (E.D.Wis.1992) (holding that a INS District Director's denial of a stay of deportation is not a "final order of deportation," and thus is a proper subject of a habeas proceeding); *Narayan v. Ilchert,* 799 F.Supp. 1047, 1049–50 (N.D.Cal.1992) (holding that the BIA's denial of a stay is a proper subject of a habeas proceeding).[9]

---

*See* 8 U.S.C. § 1105a(a)(3); *see also Vlassis v. INS,* 963 F.2d 547, 548 (2d Cir.1992).

7. A deportation order "becomes[s] final upon dismissal of an appeal by the Board of Immigration Appeals." 8 C.F.R. § 243.1. In this case, the BIA affirmed the IJ and dismissed Petitioner's appeal on January 11, 1996, thus rendering the order of deportation "final" for purposes of judicial review.

8. The "in custody" language of this provision has come to be more broadly construed in recent years. *See Galaviz–Medina v. Wooten,* 27 F.3d 487, 493 (10th Cir.1994) (tracking this change in philosophy and citing cases), *cert. denied,* — U.S. —, 115 S.Ct. 741, 130 L.Ed.2d 643 (1995). The Court believes this requirement is satisfied in this case by virtue of the combination of the final deportation order and Respondent's letter instructing Petitioner to report for deportation on May 13, 1996.

9. Although there is a consensus that district courts are confined to review of denials of stays, there is some disagreement concerning whether district courts are confined only to review of District Director (versus BIA) denials of stays. *Compare Dibi,* 801 F.Supp. at 218–20 (finding no habeas jurisdiction over a BIA denial of a stay) *with Narayan,* 799 F.Supp. at 1050 (exercising jurisdiction over a BIA denial of a stay).

This Court believes that *Dibi* states the better view. As the *Dibi* court pointed out, and as is the case here, a motion for a stay directed at the BIA typically accompanies a motion to reopen deportation proceedings, and thus is part and parcel of an overall attack on the final order of deportation. 801 F.Supp. at 219. Should the BIA deny the motion to reopen, that decision would be appealable only to the Court of Appeals. 801 F.Supp. at 220. In order to avoid both piecemeal litigation and subversion of the statutory assignment of the bulk of judicial review to the Court of Appeals, it seems appropriate for district courts to limit habeas review to a

In sum, under the law prior to enactment of the AEDPA, this Court clearly would have been able to exercise habeas jurisdiction over the District Director's denial of a stay of deportation. However, even under the prior version of § 106, Petitioner still would face one hurdle. In this case, the District Director apparently has not yet taken action on Petitioner's request for a stay.[10] Thus, there is no denial upon which this Court may rest its jurisdiction. This lack of a denial poses a serious problem; absent any action by the District Director, it is difficult for this Court to identify an abuse of discretion by the District Director. Rather, the Court is left to speculate that the District Director might deny a stay of deportation, and that her reasons for doing so might be inadequate.

█ Petitioner argues, however, that "time is of the essence" in this case, since he faces fairly imminent deportation. Thus, he contends that the District Director's failure to act quickly constitutes an effective "denial" of his request for a stay. In support of this contention, Petitioner points to a statement by the Sixth Circuit that "[t]he BIA's failure to exercise its discretion may well be an abuse of discretion." *Gonzalez v. INS*, 996 F.2d 804, 811 (6th Cir.1993); *see also Dabone v. Karn*, 763 F.2d 593, 597 n. 2 (3d

Cir.1985) (finding that the BIA's lack of action upon a motion to reopen that was pending for eleven months constituted an "effective denial" of the motion).

The Court readily accepts the proposition that, at some point, a failure to act should count as an effective denial; a contrary conclusion would allow a District Director to evade habeas review by employing dilatory tactics. Whether that point has been reached in this case, however, is not at all clear. At the time of the June 19 hearing, the request for a stay from the District Director had been pending for just over a month.[11] This degree of inaction cannot be considered an abuse of discretion *per se*. Neither does any evidence before the Court suggest that the District Director has intentionally delayed or prolonged her consideration of Petitioner's request. Accordingly, the Court is reluctant to rule that the District Director's relatively short period of deliberation represents an effective denial. To leap to this conclusion would usurp the discretion vested in District Directors to grant or deny stays of deportation, and would leave this Court to jump into the void of administrative deliberation and decide whether the District Director "should have" issued a stay.[12]

---

District Director's denial of a stay of deportation. 801 F.Supp. at 220; *see also Garay v. Slattery*, 23 F.3d 744 (2d Cir.1994) (adopting *Dibi* 's reasoning and holding).

Technically, this Court need not resolve this issue, since Petitioner has sought a stay from *both* the District Director *and* the BIA. Thus, in contrast to the situation confronting the *Dibi* court, there is no danger here that the Court might altogether lack jurisdiction—at least under the scheme in place prior to the AEDPA—by virtue of a failure to seek a stay from the District Director. However, because the Court finds that *Dibi* represents the better view of judicial review under § 106 of the INA, this opinion henceforth refers only to the District Director's failure to stay Petitioner's deportation.

**10.** Petitioner apparently sought this stay on May 13, 1996, the same day he filed his habeas petition with this Court. His counsel has indicated that as of June 14, the District Director had not acted on the request. The record does not indicate how long a District Director typically deliberates on such matters before making a decision.

**11.** Indeed, at the time this action was commenced, the District Director could be accused

of no delay whatsoever. In particular, the Court notes that Petitioner could have somewhat lessened the need for immediate action by seeking a stay from the District Director concurrently with the filing of his motion to reopen on March 20, 1996. Instead, he did not seek a stay from the District Director until May 13, the same day he filed this action.

**12.** For this same reason, the Court declines to order the mandamus relief discussed at the June 19 hearing. Counsel for Petitioner suggested that the Court might wish to consider ordering the District Director to immediately act upon Petitioner's request for a stay of deportation. However, "[a] writ of mandamus is an extraordinary remedy, and is intended to provide a remedy only if the plaintiff has exhausted all other avenues of relief and the defendant owes the plaintiff a clear nondiscretionary duty." *Willis v. Sullivan*, 931 F.2d 390, 395 (6th Cir.1991). Because the District Director's decision whether to grant a stay is discretionary, *see* 8 C.F.R. § 243.4, and because no evidence suggests that the District Director has somehow deviated from standard practice in considering Petitioner's request for a stay, the Court finds that mandamus

In any event, even if the Court were to conclude that habeas jurisdiction would have existed in this case under the pre-AEDPA version of § 106, the enactment of the AEDPA substantially affects this outcome. Specifically, the AEDPA includes two significant amendments to 8 U.S.C. § 1105a(a)(10), the provision that previously conferred such habeas jurisdiction. First, § 401(e) of the AEDPA expressly strikes that provision altogether, and § 401(f) provides that this amendment is effective "on the date of enactment of this Act." Next, § 440(a) of the AEDPA adds a new provision in place of the deleted one, which reads:

> Any final order of deportation against an alien who is deportable by reason of having committed a criminal offense covered [in various sections of the INA] shall not be subject to review by any court.

8 U.S.C. § 1105a(a)(10) (as amended by § 440(a) of the AEDPA). Because Petitioner's criminal offenses are among those referred to in the new provision, his "final order of deportation" is exempt from judicial review under the plain language of § 440(a) of the AEDPA.

■ Before the Court endeavors to interpret this new language, it must first be determined whether this newly-enacted provision should be applied in this case. Although the AEDPA specifies an effective date for § 401(e), it includes no similar statement of an effective date for § 440(a). This silence leads to a presumption that § 440(a), like § 401(e), took effect on April 24, 1996, the date of the AEDPA's enactment. *See United States v. Bafia,* 949 F.2d 1465, 1480 (7th Cir.1991), *cert. denied,* 504 U.S. 928, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992). Nevertheless, as the Supreme Court has pointed out, even an express "statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." *Landgraf v. USI Film Products,* 511 U.S. 244, ——, 114 S.Ct. 1483, 1493, 128 L.Ed.2d 229 (1994). In addition, the *Landgraf* Court noted that retroactive relief is not warranted in this case. *See Silveyra v. Moschorak,* 989 F.2d 1012, 1015 (9th Cir.

application of new legislation is disfavored, absent express statutory language to the contrary. —— U.S. at ——, 114 S.Ct. at 1496.

This Court finds that the application of § 401(e) and § 440(a) to this case poses no problem of retroactivity. As the *Landgraf* Court noted, changes in jurisdictional statutes generally are not viewed as having truly "retroactive" effects, because there is no "vested right" in having a particular court hear a claim:

> We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed.... Application of a new jurisdictional rule usually "takes away no substantive right but simply changes the tribunal that is to hear the case." Present law normally governs in such situations because jurisdictional statutes "speak to the power of the court rather than to the rights or obligations of the parties."

—— U.S. at —— – ——, 114 S.Ct. at 1501–02 (citations omitted); *see also Mendez–Rosas v. INS,* 87 F.3d 672 (5th Cir.1996) (applying § 440(a) retroactively to divest jurisdiction over an appeal commenced prior to enactment of the AEDPA); *cf. Leavitt v. Arave,* 927 F.Supp. 394 (D.Idaho 1996) (finding that the AEDPA's provisions governing habeas corpus proceedings in capital cases do not raise a retroactivity problem). *But see Reyes–Hernandez v. INS,* 89 F.3d 490 (7th Cir.1996) (holding that § 440(a) would have an improper retroactive effect if applied to cases in which deportability was conceded prior to enactment of the AEDPA); *Lewin v. INS,* No. 94–70867, 1996 WL 335359 (9th Cir. June 17, 1996) (applying the "doctrine of hypothetical jurisdiction" to reach the merits of a petition for review filed after enactment of the AEDPA).

More importantly, the Court simply is not being called upon to apply the jurisdictional provisions of the AEDPA "retroactively" in this case, at least as that notion is generally understood. Because Petitioner filed his petition for a writ of habeas corpus on May 13, 1993).

1996, *after* the enactment date of the AEDPA, § 440(a) stands as the controlling law upon which this Court's jurisdictional inquiry must rest. *See Qasguargis v. INS,* No. 96–3505, 1996 WL 338665 (6th Cir. June 17, 1996) (dismissing an appeal commenced after the AEDPA's enactment as barred by § 440(a)). Simply put, § 440(a) did not "oust" this Court's jurisdiction over this matter, since the Court had not yet exercised jurisdiction as of that provision's effective date. Thus, the Court concludes that § 440(a) of the AEDPA governs this matter.

█ Turning, then, to the substance of § 440(a), the Court finds that this amendment raises an interpretive dilemma. As noted earlier, under the previous version of § 106 of the INA, a district court's habeas jurisdiction was limited to review of INS actions *other than* final orders of deportation; final orders were to be reviewed by the Courts of Appeals. Consequently, because the amended § 106 only divests jurisdiction over certain "final order[s] of deportation," it arguably leaves untouched the district courts' habeas jurisdiction over non-final actions. At the same time, however, the amended § 106 no longer includes the prior language *affirmatively* authorizing habeas corpus proceedings for those aliens "held in custody pursuant to an order of deportation;" indeed, § 401(e) of the AEDPA explicitly deleted this language. This renders the amended § 106 utterly silent on the question of habeas jurisdiction.

The changes wrought by the AEDPA, therefore, leave the Court foundering between competing principles of statutory interpretation. On one hand, by enacting § 440(a), Congress evidently expressed its intention that those who have committed certain specified criminal offenses should not be afforded an opportunity to forestall deportation by seeking judicial review. Similarly, it is difficult to view § 401(e) as expressing anything other than congressional disapproval of habeas relief from orders of deportation. In this view, the purposeful removal of the

habeas language from § 106 utterly divests this Court of its jurisdiction.

On the other hand, the plain language of the amended § 106 limits only the review of "final orders of deportation," and the habeas jurisdiction of district courts was never predicated on such final orders. In addition, a complete lack of any review, under habeas jurisdiction or otherwise, would leave aliens without any avenue of judicial review, even where grave constitutional errors were committed during the course of INS proceedings. Thus, it is constitutionally problematic to construe the amended § 106 as altogether precluding habeas relief.[13]

For this reason, at least one court has held that the more general habeas statute found at 28 U.S.C. § 2241 continues to provide a jurisdictional basis for habeas relief from deportation orders, even though the amended § 106 no longer confers such jurisdiction. *Mbiya v. INS,* 930 F.Supp. 609 (N.D.Ga. 1996). The *Mbiya* court further held, however, that § 440(a) of the AEDPA nevertheless serves to limit the availability of habeas relief. The court reasoned that the Constitution, and hence 28 U.S.C. § 2241, "requires only that the writ of habeas corpus extend to those situations in which the petitioner's deportation would result in a fundamental miscarriage of justice." 930 F.Supp. at 612.

This Court readily acknowledges the concerns inherent in adopting any of the competing constructions of § 106 as amended by §§ 401(e) and 440(a) of the AEDPA. However, it is difficult to overlook the plain fact that those amendments expressly remove a clear grant of habeas jurisdiction, and replace it with sweeping language that appears to foreclose *all* judicial review for aliens who are subject to deportation as a result of committing certain criminal offenses. Petitioner unquestionably has been found deportable by virtue of having committed certain of the offenses specified in § 440(a) of the AEDPA. Accordingly, this Court, like the court in *Mbiya,* concludes that habeas relief is available in this case only if Petitioner can identify a grave constitutional error or a

---

13. Perhaps this is why Respondent's most recent reply brief apparently concedes, without discussion, that § 440(a) of the AEDPA does not divest this Court of its habeas jurisdiction over this matter.

fundamental miscarriage of justice in his deportation proceedings. With this guiding principle in mind, the Court now examines the substance of Petitioner's claims for habeas relief.

### B. *None of the Claims Asserted By Petitioner Rises to the Level of a Fundamental Miscarriage of Justice.*

As explained above, this Court construes the relevant provisions of the AEDPA as requiring that Petitioner identify a grave constitutional error or fundamental miscarriage of justice in his deportation proceedings in order to qualify for habeas relief.[14] In addition, because this is a habeas proceeding, the Court must "assess the probability of the alien's prevailing on review." *Stone v. INS,* —— U.S. ——, ——, 115 S.Ct. 1537, 1546, 131 L.Ed.2d 465 (1995). Indeed, the parties agree that the Court is essentially being asked to grant relief in the nature of a preliminary injunction, and that the Court therefore must consider the likelihood of Petitioner's success in his pending motions before the BIA.

### 1. *Petitioner Has Failed to Establish His Claim of Ineffective Assistance of Counsel.*

 Petitioner contends that two defects in the course of his deportation proceedings rise to the level necessary to warrant habeas relief. The first of these claimed defects, ineffective assistance of counsel during Petitioner's initial round of INS proceedings, is relatively easily disposed of. In support of his claim of ineffective assistance, Petitioner submits the affidavit of Carlos M. Recio, his co-counsel before this Court, in which it is claimed that competent counsel would have recognized that Petitioner was eligible for a combination of § 212(c) relief and § 245(a) adjustment of status.[15] Instead, Petitioner's counsel pursued only § 212(c) relief before the IJ, an approach that, according to the Recio affidavit, was certain to fail.

The Court finds that this claim of ineffective assistance is without merit. First, the failure to seek relief that was only recognized in the BIA's 1993 *Gabryelsky* decision, *after* Petitioner's hearing before the IJ, can hardly be viewed as lying "outside the wide range of professionally competent assistance." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).[16] The cases cited by Petitioner are not to the contrary; rather, each involved a more fundamental abridgement of the right to competent counsel in INS proceedings. *See, e.g., Dokic v. INS,* 899 F.2d 530 (6th Cir.1990) (finding a colorable claim of ineffective assistance where counsel failed to file a brief in support of a BIA appeal); *Snajder v. INS,* 29 F.3d 1203 (7th Cir.1994) (finding a denial of right to counsel where, in contravention of INS regulations, the IJ failed to advise the *pro se* alien of this right upon the INS citing an additional basis for deportation during a hearing); *Batanic v. INS,* 12 F.3d 662 (7th Cir.1993) (finding a denial of right to counsel where an alien's attorney was prohibited from attending a hearing).

Neither can the Court accept Petitioner's argument that the result in *Gabryelsky* was somehow "foreordained" in light of prior cases and BIA decisions. Plainly, neither the IJ, whose decision was reversed by the BIA in *Gabryelsky,* nor the INS, which opposed the relief recognized in that BIA decision, believed that the result was dictated by precedent. In addition, the Court points out

---

**14.** The parties' briefs state that the District Director's failure to grant Petitioner a stay of deportation should be evaluated under an "abuse of discretion" standard. To be sure, this standard would have governed this Court's habeas review had the AEDPA not been enacted. *See, e.g., Bal v. Moyer,* 883 F.2d 45, 46–47 (7th Cir.1989) (holding that a District Director's denial of a stay constitutes an abuse of discretion where the denial is made without rational explanation, inexplicably departs from past practice or established policies, or rests on an impermissible basis such as discrimination against a particular race or group). However, as explained above, the enact-

ment of the AEDPA has narrowed this Court's standard of review.

**15.** The Court notes that this ineffective assistance argument is not asserted as a ground in support of the motion to reopen Petitioner recently filed with the BIA.

**16.** Indeed, as Respondent points out, counsel for aliens often choose not to seek all potential relief at an initial hearing, since the goal in some cases is simply to prolong deportation proceedings as much as possible.

that the BIA relied on INS regulations, rather than prior case law or administrative decisions, in determining in *Gabryelsky* that a § 245 adjustment of status could be combined with § 212(c) relief in order to seek waiver of two independent grounds of deportability.

Moreover, there is an inherent inconsistency in Petitioner's claim of ineffective assistance of counsel. Both in his motion to reopen and before this Court, Petitioner argues that a stay of deportation should be granted because he was unaware of the possibility of an alternative basis for avoiding deportation until the BIA cited *Gabryelsky* in its 1996 decision denying his appeal. Indeed, in his motion to reopen, Petitioner expressly maintains that the relief approved in *Gabryelsky* "could not have been discovered" in time to present relevant evidence to the IJ. Yet, he also contends that his counsel was incompetent in failing to pursue *Gabryelsky*-type relief at his initial hearing in 1993. If the availability of the relief recognized in *Gabryelsky* was a matter of common knowledge as far back as 1993 (and even before *Gabryelsky* itself was decided, according to the Recio affidavit), then Petitioner clearly need not have relied on the BIA's 1996 decision in his case to become aware of an alternate avenue of relief. Thus, the Court concludes that Petitioner has failed to demonstrate ineffective assistance of counsel during his first round of deportation proceedings.[17]

### 2. Petitioner Has Failed to Identify a Due Process Violation.

■ Petitioner's next claim is best viewed as resting upon due process grounds. He contends that the enforcement arm of the INS is acting too hastily by instructing him to report for deportation while his motion to reopen deportation proceedings is still pending before the BIA. In essence, Petitioner asserts that he is being denied a fair opportunity to seek the relief recognized in *Gabryelsky*. For a number of reasons, however, the Court concludes that this lack of an opportunity does not implicate due process concerns.

As an initial matter, the Court questions whether Petitioner's opportunity to pursue alternative avenues of relief from deportation accrued only upon the BIA citing *Gabryelsky* when dismissing his appeal earlier this year. Rather, it appears that, if Petitioner had become aware of this alternative while his appeal was pending, he could have petitioned the BIA to consider this new basis for relief as part of its ongoing review of the IJ's decision. Surely the BIA carries no affirmative duty to inform all those who are involved in pending INS proceedings that alternative avenues of relief might have become available. Thus, the Court cannot conclude that Petitioner's need for immediate action, either by this Court or by the District Director, can be attributed to any INS wrongdoing, or even a lack of diligence on the agency's part.

Neither does the Court find that the District Director committed a *per se* due process violation simply by failing to immediately act upon Petitioner's request for a stay of deportation. Petitioner can claim no entitlement to a stay; rather, such a stay is a "matter of grace," *Foroughi v. INS,* 60 F.3d 570, 574 (9th Cir.1995); *Bothyo v. Moyer,* 772 F.2d 353, 356 (7th Cir.1985), and the District Director is free to deny Petitioner's request notwithstanding his pending motion to reopen, *see Khalaj v. Cole,* 46 F.3d 828, 832 (8th Cir.1995). Moreover, the Court can hardly accuse the District Director of undue hesitation, given that Petitioner sought a stay from the District Director only on May 13, 1996.

Therefore, having found no patent due process violation in the District Director's failure to grant an immediate stay pending further action by the BIA, the Court next considers whether the strength of Petitioner's claim on the merits dictates that his deportation be stayed. For two reasons, the Court finds that Petitioner is not entitled to a stay in

---

17. The Court also notes that Petitioner's ineffective assistance claim essentially challenges the validity of his first proceeding before the INS, as well as the final order of deportation which resulted from that proceeding. As discussed earlier, such challenges to a final order of deportation are more appropriately addressed to the Court of Appeals upon the BIA's dismissal of an administrative appeal. *See, e.g., Dokic,* 899 F.2d at 531.

order to pursue the form of relief recognized in *Gabryelsky*. First, upon reviewing the statutory deportation scheme as well as the relevant case law and administrative decisions, the Court concludes that the combination of relief approved by the BIA in *Gabryelsky* simply cannot be reconciled with any plausible interpretation of the statutes governing deportation. Next, the Court finds that the AEDPA forecloses this avenue of relief in any event, and further concludes that the changes made by the AEDPA should govern the BIA's resolution of Petitioner's motion to reopen. In short, under either the pre- or post-AEDPA version of the deportation statutes, Petitioner is not entitled to the relief he seeks.

### a. The Form of Relief Recognized in Gabryelsky *Runs Counter to the* Statutory Deportation Scheme.

As explained earlier, Petitioner's efforts to secure a stay of deportation rest upon the assumption that, should he obtain such a stay, he would then have a colorable claim to the combination of relief recognized by the BIA in *Gabryelsky*. Setting aside for the moment the implications of the AEDPA to this form of relief, the Court first inquires whether the pre-AEDPA version of the statutory deportation scheme authorizes such relief. The Court answers this inquiry in the negative, holding that the *Gabryelsky* decision, as well as the relief sought by Petitioner pursuant to that decision, is wholly unsupported by any plausible construction of the statutory deportation scheme.

It is a fundamental principle of administrative law that, where a statute evinces a clear statement of congressional intent, an agency's construction of that statute "must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*

467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Even where a statute is "silent or ambiguous with respect to [a] specific issue," thus leaving "a gap for the agency to fill," the agency's interpretation will be set aside if it is "arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. at 843–44, 104 S.Ct. at 2782; *see also Hamama v. INS,* 78 F.3d 233, 239 (6th Cir.1996) (applying the *Chevron* analysis to a BIA decision).

As noted earlier, the BIA in *Gabryelsky* found that individuals who are subject to deportation may seek a combination of two forms of discretionary relief, despite the fact that neither relevant statutory provision, on its face, appears to make such relief available in deportation proceedings. In the first step of this two-step process, an alien applies for an "adjustment of status" under § 245 of the INA. Section 245 grants the Attorney General the discretion to adjust the status of an alien to "that of an alien lawfully admitted for permanent residence," provided that certain conditions are satisfied. 8 U.S.C. § 1255(a).[18] Although Petitioner is *already* a lawfully admitted permanent resident alien, and although the caption of § 245 speaks of adjusting the status of a "nonimmigrant," the Second Circuit long ago held that § 245 relief is available to *all* aliens, including those in Petitioner's position, and not just to nonimmigrants. *Tibke v. INS,* 335 F.2d 42 (2d Cir.1964).[19]

The end result of Petitioner's appeal to § 245 would be to position him as, in effect, an alien seeking entry into the United States. Because firearms offenses are not grounds for exclusion of aliens seeking entry, Petitioner would not be barred from "entering" the country by virtue of his firearms conviction. However, because § 245, unlike § 212(c), does not expressly authorize the

---

**18.** Petitioner here appears to have satisfied all of these conditions for eligibility for § 245 relief.

**19.** The *Tibke* court reasoned that the express language of § 245(a), as opposed to its caption, plainly provides that adjustment of status is available to "aliens," immigrant and nonimmigrant alike. 335 F.2d at 44. Moreover, the court noted that a recent amendment to § 245 had removed its prior "bona fide nonimmigrant" language and substituted the more general term

"alien." 335 F.2d at 45. Finally, the court rejected the argument that its construction of § 245 would make a "dead letter" of § 244, the "suspension of deportation" statute, which already provided a means for an alien subject to deportation to appeal to the Attorney General to suspend his deportation and adjust his status to that of a lawful permanent resident alien. 335 F.2d at 46–47.

Attorney General to grant discretionary relief in spite of criminal convictions, thereby effectively "waiving" those convictions, it would seem that Petitioner's drug and firearms convictions would render him immediately subject to deportation upon his "entry" under § 245. Under this reasoning, a grant of § 245 relief would be futile.

Once again, though, a BIA decision permits Petitioner to avoid this dilemma. In *Matter of Rainford,* Int. Dec. 3191, 1992 WL 323809 (B.I.A. Sept. 9, 1992), the BIA overturned an immigration judge's determination that § 245 relief would be futile in the case of an alien who, like Petitioner, had been found deportable by virtue of a firearms conviction. Because the exclusion provisions of the INA do not specify firearms convictions as grounds for exclusion, the BIA reasoned that such convictions should not render an alien ineligible for § 245 relief. Under *Rainford*'s interpretation, then, § 245 has the rather remarkable effect of *not only* reclassifying an alien such as Petitioner to the same status he already enjoyed, *but also* completely expunging from that alien's record any criminal convictions that are not listed as grounds of exclusion. Specifically, in the instant case, if Petitioner is granted the § 245 relief he seeks, he will effectively stand in the same shoes as an alien seeking entry despite drug, *but not firearms,* convictions.

From this point, the second step of the relief approved in *Gabryelsky* is relatively straightforward. With a drug conviction as his only remaining obstacle, Petitioner may appeal to § 212(c) of the INA, which, as noted earlier, permits the Attorney General to admit "[a]liens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation," notwithstanding certain criminal convictions or other grounds of exclusion listed in § 212(a). 8 U.S.C. § 1182(c). Because § 212(a) lists drug convictions as grounds for exclusion, *see* 8 U.S.C. § 1182(a)(2)(A)(i)(II), § 212(c) effectively grants the Attorney General the discretion to "waive" such convictions and permit entry. *Gonzalez v. INS,* 996 F.2d 804, 806 (6th Cir.1993). Moreover, despite the "exclusion" and "entry" language of § 212, courts have permitted aliens to invoke that provision in deportation proceedings. *See Gonzalez,* 996 F.2d at 806; *Francis v. INS,* 532 F.2d 268 (2d Cir.1976).

Upon this already questionable foundation rests *Gabryelsky.* In that decision, the BIA relied upon INS regulations to conclude that the two forms of relief previously recognized as available under § 245 and § 212(c) could be invoked in combination to avoid deportation. In essence, *Gabryelsky* permits an alien to "split" his convictions into two classes: those which can be waived under § 212(c), and those which are not grounds for exclusion, and can therefore be overcome by an adjustment of status under § 245. This "divide and conquer" approach permits an alien to achieve a remarkable result: deportation may be avoided despite a panoply of convictions, each of which *by itself* would be a ground for deportation. What is more, this result is achieved through exclusive reliance on statutory provisions that are intended to govern exclusion rather than deportation.

■ Petitioner argues that this avenue of relief enjoys the support of the Attorney General and the judiciary, and that it is consistent with congressional intent. The Court cannot agree. The entire *Gabryelsky* approach evidently rests on notions of fairness and equal treatment: namely, that it would be unfair to deport an alien on grounds that would not bar his entry. These notions derive primarily from the Second Circuit's decision in *Francis,* supra, holding that § 212(c) relief is available in deportation proceedings. Although that provision requires that an alien must "temporarily proceed[ ] abroad voluntarily" to be eligible for discretionary relief upon re-entry, *see* 8 U.S.C. § 1182(c), the *Francis* court found that there was no rational basis for distinguishing between aliens who temporarily leave the country and those who do not. 532 F.2d at 273. The court explained:

> The government has failed to suggest any reason why this petitioner's failure to travel abroad following his conviction should be a crucial factor in determining whether he may be permitted to remain in this country. Reason and fairness would suggest that an alien whose ties with this country

are so strong that he has never departed after his initial entry should receive at least as much consideration as an individual who may leave and return from time to time.

532 F.2d at 273.

This Court need not decide whether the *Francis* analysis is correct.[20] Rather, it is enough to point out that both the Attorney General and the courts have declined to extend its rationale. First, in *Matter of Hernandez–Casillas,* Int.Dec. 3147, 1990 WL 385764 (Att'y Gen. Mar. 18, 1991), the Attorney General disapproved a BIA decision that a ground for deportation could be waived under § 212(c) despite the absence of any corresponding ground for exclusion under § 212(a). Although "leav[ing] for another day the question of whether [a BIA decision adopting *Francis* ] should be disapproved," 1990 WL 385764 at *20, the Attorney General concluded that "the guarantee of equal protection does not require[ ] the further departure from the terms of section 212(c) made by the Board in this case." 1990 WL 385764 at *21. In addition, the Attorney General flatly rejected the BIA's statement that there was "no reason not to" make § 212(c) relief available regardless of the basis for deportation:

This bald assertion simply is not enough to justify the Board's decision to wrench away even further from the statutory text. Absent some supervening affirmative justification based upon a requirement of the

Constitution or other applicable law, neither the Board nor I may depart—or, in this instance, extend an earlier departure—from the terms of the statute we are bound to enforce.

1990 WL 385764 at *22.

Similarly, the First Circuit has spoken approvingly of the Attorney General's decision in *Hernandez–Casillas,* and has agreed that extension of *Francis* is unwarranted. *Campos v. INS,* 961 F.2d 309 (1st Cir.1992). The court discussed at length the difficulties that have resulted from judicial and administrative superimposition of such notions as "fairness" upon the statutory deportation scheme:

[T]he combined effect of § 212(c) and the interpretation in *Francis* and its aftermath, is to create an untidy patchwork, even, one might say, a mess. It is hard to imagine that a congressman or senator who thought about the matter would be pleased with the present state of affairs. But we think the most propitious means of improvement lies with Congress. Further speculative tinkering by courts with a statute that says one thing but is supposed to mean another will likely as not result in even more confusion. Courts have no license to rewrite legislation merely because it is poorly framed. While most legislators might agree that the present state of affairs is undesirable, all would not agree on what steps to take to reform it. Courts

---

**20.** Clearly, there are reasons to question it. First, as the *Francis* court conceded, Congress has "virtually unrestricted" authority to "regulate the admission and retention of aliens." 532 F.2d at 272; *see also Hamama,* 78 F.3d at 237. Accordingly, courts must give deference to any distinctions Congress has seen fit to draw in the immigration laws. *Hamama,* 78 F.3d at 237.

Next, although the *Francis* court was unable to identify any rational basis for distinguishing between those aliens who have travelled abroad and those who have not, this Court sees at least two bases for drawing such a distinction. First, those aliens who travel abroad despite criminal convictions that render them deportable effectively force the INS to conduct an exclusion inquiry upon their attempted return to the United States; thus, those who leave run a substantial risk that they will not be permitted to reenter. In contrast, those aliens with criminal convictions who do not leave the United States

will be permitted to remain until the INS sees fit to institute deportation proceedings, and until those proceedings run their course. Because an alien in the first scenario "forces the issue" by travelling abroad, it arguably makes sense to grant the Attorney General greater discretion in making the more pressing decision whether to exclude that alien upon his attempt to return.

More generally, there is a fundamental distinction between those aliens who seek entry into the United States and those who face deportation. Although those aliens who face deportation have much to lose, they have also had the opportunity to benefit from the privileges flowing from United States residency. Congress could reasonably conclude that those who are presently enjoying those privileges should be subject to a greater degree of regulation, and thus should be eligible for less discretionary relief, than those who are seeking an initial opportunity to enjoy those privileges.

are not the proper bodies to take on such tasks.

\* \* \* \* \* \*

To be sure, when to avoid perceived equal protection problems the statute was stretched beyond its language to apply to deportation proceedings, problems crept in. If impatience with the legislative language had not resulted in adding nonexistent provisions to the statute in the first place, Congress would likely have recognized the defects and long ago repaired any problems at the instance of the Attorney General, the INS and those concerned with the welfare of resident aliens. The question now becomes whether to engage in a second judicial rewriting of the statute in order to improve upon the first rewriting. This would be legislation pure and simple. As a starting point, there is not even the justification of linguistic ambiguity. Continued judicial redrafting simply insures that the statute will less and less be the recognizable product of the legislative will. We think a statute of this detailed nature is best left to the ministrations of Congress. We decline to tinker further.

961 F.2d at 315, 316–17; *see also Leal–Rodriguez v. INS*, 990 F.2d 939, 952 (7th Cir. 1993) ("We are reluctant ... to conclude that once the initial judicial extension of waiver of exclusion relief was made from *no* grounds for deportation to *most* grounds for deportation, further action by the judiciary must be taken to expand section 212(c) to cover *all* grounds.").

This Court concludes that *Gabryelsky* likewise represents unwarranted and ill-advised tinkering with the statutory deportation scheme. As an initial matter, the Court cannot help but observe that the BIA's decision in *Gabryelsky* achieves the very same result rejected by the Attorney General in *Hernandez–Casillas* and the First Circuit in *Campos*. Simply put, *Gabryelsky*, like the BIA's overturned decision in *Hernandez–Casillas*, permits waiver of a ground for deportation despite the absence of a corresponding ground for exclusion under § 212(a). Moreover, the BIA's decision in *Gabryelsky*, like its overturned decision in *Hernandez–Casil-*

*las,* cites no constitutional or statutory basis for extending the *Francis* "patchwork" any further. Rather, *Gabryelsky* rests principally on INS regulations, a dubious source of a new form of relief.

This result is made no more palatable, in this Court's judgment, by the fact that § 245 is used in conjunction with § 212(c) in order to achieve it. To the contrary, invocation of § 245 merely compounds the administrative sleight-of-hand that has thwarted the deportation scheme duly enacted by Congress. *Rainford,* the BIA decision that somehow located within § 245 the authorization to waive grounds for deportation, has never been the target of judicial scrutiny; indeed, this Court's research indicates that *Rainford* has been cited in only two cases, both merely in passing. *See Henry v. INS,* 74 F.3d 1, 3 (1st Cir.1996); *Snajder v. INS,* 29 F.3d 1203, 1207–08 (7th Cir.1994). Moreover, *Gabryelsky*'s reliance on *Rainford* only compounds the "fiction"—now more a tall tale of increasingly fantastic proportions—that aliens who are subject to deportation may instead be viewed as aliens seeking entry into the United States.

This Court does not doubt that this fiction is the product of administrative notions of fairness. However, it is the job of Congress, rather than agencies or the judiciary, to dictate the shape of this country's deportation and exclusion schemes. So long as those schemes comport with the Constitution, neither this Court nor the BIA may reshape them. Because *Gabryelsky* identifies no constitutional basis for deviating from the statutory deportation scheme, and because that scheme clearly renders ineligible for a § 212(c) waiver those aliens who have committed firearms offenses, the Court concludes that the relief recognized in *Gabryelsky* does not comport with the intent of Congress, and therefore is not available to Petitioner.

**b. *Section 440(d) of the AEDPA Forecloses the Relief Sought by Petitioner.***

Even if the Court were able to identify a statutory basis for the relief Petitioner seeks from the BIA, Petitioner would confront yet another difficulty. In particular,

just as the AEDPA entered into the Court's jurisdictional inquiry, it also enters into the Court's limited inquiry into the merits of Petitioner's claim for relief from deportation. As discussed earlier, Petitioner's motion to reopen is predicated on a combination of relief available under § 245 and § 212(c) of the INA—*i.e.,* the combination of relief approved by the BIA in *Gabryelsky.* However, § 440(d) of the AEDPA amends § 212(c), and appears to foreclose the relief Petitioner is seeking.

After enactment of the AEDPA, § 212(c) now provides, in pertinent part:

> This subsection [*i.e.,* the discretionary waiver of grounds of exclusion] shall not apply to an alien who is deportable by reason of having committed any criminal offense covered by § 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by § 241(a)(2)(A)(ii) for which both predicate offenses are covered by § 241(a)(2)(A)(i).

8 U.S.C. § 1182(c) (as amended by § 440(d) of the AEDPA). Petitioner's drug and firearms violations both are among the offenses referenced in the amended § 212(c). Accordingly, the parties agree that, assuming it applies,[21] the amended § 212(c) forecloses Petitioner's attempt to seek a waiver of these two grounds for deportation. In other words, this amendment appears to preclude the relief recognized in the BIA's *Gabryelsky* decision. Consequently, if the amended § 212(c) governs the BIA's consideration of Petitioner's motion to reopen, the result is foreordained—Petitioner will not be entitled to the relief he seeks.

However, Petitioner contends that the amended § 212(c) should not be applied in his case because of its impermissible retroactive effects. Specifically, Petitioner argues that application of the AEDPA amendment would: (1) attach new consequences to criminal activities that occurred well before the AEDPA's enactment, and (2) foreclose an avenue of relief for which Petitioner had already applied prior to the AEDPA's enactment.

In support of this contention, Petitioner relies on *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In that case, the Supreme Court first endeavored to ascertain whether the statute in question, a provision of the Civil Rights Act of 1991, included a clear directive from Congress that it should or should not be retroactively applied. 511 U.S. at ——, 114 S.Ct. at 1496. Finding no such clear expression of congressional intent, in either the text or the legislative history, the Court turned to the traditional canons of statutory construction. In particular, Petitioner points to the *Landgraf* Court's recognition of the proposition that "[r]etroactivity is not favored in the law." 511 U.S. at ——, 114 S.Ct. at 1496 (quoting *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988)).

In this case, § 440(d) of the AEDPA similarly lacks any language stating an effective date or specifying the scope of its application. Neither does the legislative history shed light on these questions. It is well settled that, where a statute fails to state otherwise, the effective date is the date of

---

**21.** Petitioner cites two reasons why § 440(d) of the AEDPA does not apply in this case. First, he points to purported retroactivity problems; this claim is considered at length below. Next, Petitioner contends that this amendment does not govern this matter because, by seeking a § 245(a) adjustment of status, he is more properly viewed as involved in "exclusion" rather than "deportation" proceedings. Thus, Petitioner concludes that he is no longer "deportable" because of his convictions, but instead is "excludable."

The Court finds this suggestion patently absurd. Although, by its very terms, § 212 is concerned with exclusion proceedings, the BIA and the courts have nonetheless construed it as providing an avenue of relief for those facing deportation. *See, e.g., Gonzalez v. INS,* 996 F.2d 804,

806 (6th Cir.1993). Petitioner now invites this Court to put yet another, and far more expansive, "judicial gloss" on the amended § 212(c) by altogether ignoring its "deportable" language whenever an individual who is subject to deportation by virtue of criminal convictions—such as Petitioner here—can somehow position himself as eligible for relief that, under clear statutory language, is available only to those in exclusion proceedings. The Court declines to engage in such a "bootstrapping" exercise to circumvent the plain language of the amended § 212(c). Moreover, even if an alien were truly involved in exclusion proceedings, there is no reason why the "deportable" inquiry called for under the amended § 212(c) could not still be performed.

enactment. *See, e.g., United States v. Bafia,* 949 F.2d 1465, 1480 (7th Cir.1991), *cert. denied,* 504 U.S. 928, 112 S.Ct. 1989, 118 L.Ed.2d 586 (1992). Nevertheless, as noted earlier, a determination of a statute's "effective date" does not resolve the separate issue of that statute's applicability to past conduct. *See Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1493.

Accordingly, the Court examines more closely the presumption against retroactive application of statutes.[22] This presumption rests upon the notion that "individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." *Landgraf,* at ——, 114 S.Ct. at 1497. The presumption against retroactivity, therefore, applies with greatest force in situations where individuals most need to act with "confidence about the legal consequences of their actions." 511 U.S. at ——, 114 S.Ct. at 1497. Given this focus on "settled expectations," it is important to ascertain whether § 440(d) of the AEDPA can truly be seen as upsetting such expectations, and whether it consequently should be viewed as having "retroactive" effects in the instant case.

As an initial matter, the Court questions whether the retroactive effect of § 440(d) can be surmised merely from the fact that this amendment forecloses a previously available avenue of relief. As explained in *Landgraf:*

> A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law. Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.

511 U.S. at ——, 114 S.Ct. at 1499 (citation and footnote omitted).

Applying this analysis to the matter at hand, the Court is simply unable to conclude that application of § 440(d) of the AEDPA would have impermissible retroactive effects on Petitioner. First, it can hardly be said that this amendment upsets any expectations Petitioner might have had at the time of his convictions. Indeed, since the availability of *Gabryelsky*-type relief was recognized only in 1993, well *after* Petitioner's convictions, § 440(d) of the AEDPA actually restores the law to the state it was in when Petitioner engaged in his criminal activities. Viewed in this light, § 440(d) does not impose additional consequences on past conduct. Moreover, it seems doubtful that aliens consider and weigh the possible avenues of relief from deportation before they choose to engage in criminal activities.[23]

Next, the Court does not believe that § 440(d) is imbued with retroactive effects merely because Petitioner had applied for relief under *Gabryelsky* prior to the enact-

---

**22.** Of course, the *Landgraf* Court noted that this presumption is somewhat at odds with a competing canon of statutory interpretation: namely, that a court should generally apply the law as it stands at the time its decision is rendered. 511 U.S. at ——, 114 S.Ct. at 1496. This principle applies as well to administrative agencies. *See Tackett v. Benefits Review Bd.,* 806 F.2d 640, 642 (6th Cir.1986).

**23.** Petitioner cites two other examples of "expectations" which have been upset by § 440(d). First, he argues that the availability of various avenues of relief might enter into an alien's decision whether to plead guilty to a criminal offense. Next, he contends that he might not have conceded his deportability at the hearing before the IJ if he had known that § 212(c) relief would

subsequently be severely curtailed. *Cf. Reyes–Hernandez v. INS,* 89 F.3d 490, 492 (7th Cir. 1996) (subscribing to this theory of the retroactive effect of § 440(d)).

The Court finds the first "expectation" much too tenuous and speculative to be considered in an analysis of retroactivity. As for the second argument, it rests upon the false factual premise that § 212(c) relief is now *less* available to Petitioner than it was at the time of his hearing. In fact, the IJ found, and the BIA affirmed, that Petitioner was ineligible for § 212(c) relief, even in its pre-amended form. Thus, the amended § 212(c) can properly be viewed as returning the law to the state it was in at the time of Petitioner's hearing, *before* the *Gabryelsky* decision was issued.

ment of the AEDPA. Rather, since Petitioner is still in the process of establishing his eligibility for this discretionary relief, the Attorney General has not yet been called upon to address the merits of Petitioner's most recent attempt to avoid deportation. Stated differently, by filing a motion to reopen, Petitioner in essence is seeking a "second bite of the apple" by pursuing an entirely separate avenue of relief. Under these circumstances, it appears altogether appropriate that the BIA should treat Petitioner's motion to reopen as requesting an entirely new and separate proceeding, and that the BIA should therefore apply current law in evaluating this latest claim for relief.[24]

In effect, then, § 440(d) simply "affects the propriety of prospective relief" in Petitioner's case, and therefore has no retroactive effect. *Landgraf*, 511 U.S. at ——, 114 S.Ct. at 1501. Contrary to Petitioner's assertion, there is nothing inherently unfair in this removal of one avenue of prospective relief. As the Sixth Circuit has recognized, given the clear authority of Congress to mandate deportation on the basis of past criminal conduct, "Congress has just as much authority to bar *relief* from deportation on the basis of past criminal conduct." *Campos v. INS*, 16 F.3d 118, 122 (6th Cir.1994) (emphasis added). Such a repeal of discretionary authority "is by no means the equivalent of a change in punishment," and therefore does not implicate ex post facto or due process concerns. 16 F.3d at 122. More broadly, the Sixth Circuit has noted "the Supreme Court's longstanding willingness to allow application of new immigration law to prior criminal conduct." *Hamama v. INS*, 78 F.3d 233, 235 (6th Cir.1996).

In sum, the Court finds that the BIA should apply § 440(d) of the AEDPA in evaluating Petitioner's motion to reopen. Because that amendment evidently forecloses the relief Petitioner is seeking, the BIA is likely to deny Petitioner's motion to reopen. Alternatively, as explained earlier, even if the BIA determines that the pre-AEDPA version of the statutory deportation scheme governs Petitioner's motion to reopen, the Court finds that the relief sought by Petitioner is flatly inconsistent with that scheme. It follows that the BIA, notwithstanding its decision in *Gabryelsky*, is not authorized to grant such relief. Consequently, in light of Petitioner's failure to establish his likelihood of prevailing before the BIA, and in light of the Court's inability to identify any due process violation in the District Director's failure to grant a stay of deportation, the Court declines to grant the habeas relief sought by Petitioner. To grant a stay would only afford Petitioner an illusory opportunity to seek relief that is not available under the INA.

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that the Petition for a Writ of Habeas Corpus be DISMISSED.

---

24. Because Petitioner is seeking a second form of relief that was not addressed by either party throughout his first round of INS proceedings, this case is distinguishable from those in which the law changed unfavorably to an applicant in the interval between an administrative hearing and a subsequent decision by an appellate administrative board. *Compare Tackett v. Benefits Review Bd.*, 806 F.2d 640, 642 (6th Cir.1986) (remanding to an administrative agency so that the applicant could present evidence directed at an intervening change in the law).

 Likewise, the procedural posture of this case is distinguishable from the situations presented in two post-AEDPA decisions, one by the Seventh Circuit and one by the BIA, both of which concluded that application of § 440(d) to an individual who had already applied for § 212(c) relief would have an impermissible retroactive effect. *See Reyes–Hernandez v. INS*, 89 F.3d 490 (7th Cir.1996); *In re Soriano*, No. A39–186–067 (B.I.A. June 27, 1996). Neither case involved a motion to reopen; rather, in each case, the applicant for § 212(c) relief was still engaged in his first round of deportation proceedings and judicial review when the AEDPA took effect.